2013-1568

---

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

ROCHE VITAMINS, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

---

Appeal from the United States Court of International Trade in case no. 04-CV-0175, Judge Richard K. Eaton.

---

BRIEF FOR DEFENDANT-APPELLANT UNITED STATES

---

STUART F. DELERY
Assistant Attorney General

JEANNE E. DAVIDSON
Director

OF COUNSEL:

EDWARD N. MAURER
SHERYL A. FRENCH
Office of Assistant Chief Counsel
International Trade Litigation
U.S. Customs & Border Protection
New York, New York

PATRICIA M. McCARTHY
Assistant Director
Commercial Litigation Branch
Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel. (202) 307-0164
Fax (202) 514-7969
patricia.mccarthy@usdoj.gov
Attorneys for Defendant-Appellant
United States

February 18, 2014

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION.........................................................................1

STATEMENT OF THE ISSUE.............................................................................2

STATEMENT OF THE CASE..............................................................................2

STATEMENT OF FACTS ...................................................................................6

   I.       Administrative Proceeding.................................................................6

   II.      Course Of Proceedings Below .........................................................8

SUMMARY OF THE ARGUMENT ...................................................................13

ARGUMENT .....................................................................................................14

   I.       Standard Of Review ........................................................................14

   II.      The Trial Court Erred As A Matter Of Law By Adding A
           "Not An Ordinary Use" Requirement To The Exclusions Of
           Goods Classifiable Under Chapter 29.............................................15

           A.    The Trial Court's Interpretation Of "Specific Use"
                  Is Contrary To The Text Of Note 1 To Chapter 29.................16

           B.    The Trial Court's Interpretation Of "Specific Use"
                  Is Inconsistent With This Court's Precedent ...........................23

CONCLUSION ..................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Bradford Indus., Inc. v. United States*,
    152 F.3d 1339 (Fed. Cir. 1998) ....................................................15

*Degussa Corp. v. United States*,
    508 F.3d 1044 (Fed. Cir. 2007) ...........................................passim

*Orlando Food Corp. v. United States*,
    140 F.3d 1437 (Fed. Cir. 1998) ....................................................15

*Roche Vitamins, Inc. v. United States*,
    750 F. Supp. 2d 1367 (Ct. Int'l Trade 2010)........................passim

*Roche Vitamins, Inc. v. United States*,
    791 F. Supp. 2d 1315 (Ct. Int'l Trade 2011).....................................4

*Roche Vitamins, Inc. v. United States*,
    922 F. Supp. 2d 1353 (Ct. Int'l Trade 2013)........................passim

## STATUTES

28 U.S.C. § 1295(a)(5).............................................................................1

28 U.S.C. § 1581(a) .........................................................................1, 6

iii

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5, counsel for defendant-appellant, United States, states that (1) there are no other appeals arising from the judgment below that are the subject of this appeal before this or any other court of appeals, and (2) there are numerous cases filed by plaintiff-appellee or other importers that are currently pending in the United States Court of International Trade and will be directly affected by the Court's decision in this appeal. These include Court of International Trade Nos. 12-0422; 01-1094; 02-0259; 02-0558; 03-0111; 03-0112; 03-0499; 04-0129; 04-0166; 04-0167; 04-0286; 04-0471; 05-0011; 05-0093; 05-0255; 05-0427; 05-0446; 05-0451; 05-0482; 05-0518; 05-0653; 06-0003; 06-0010; 08-0002; 09-0268; 13-0318; 03-0926; 07-0251; 13-0109; 05-0043; 13-0129; 12-0026; 05-0043; 13-0129; 12-0026; 05-0411; 05-0410; 05-0577; 06-0021; 06-0022; 06-0061; 06-0254; 06-0414; 06-0452; 07-0090; 07-0187; 07-0188; 07-0397; 07-0399; 07-0470; 08-0185; 08-0186; 08-0280; 08-0281; 09-0003; 09-0069; 09-0070; 09-0244; 09-0372; 09-0373; 10-0029; 10-0030; 10-0224; 10-0225; 10-0268; 11-0058; 11-0059; 11-0067; 11-0287; 11-0288; 11-0289; 12-0028; 12-0034; 12-0143; 12-0144; 12-0171; 12-0334; 12-0357; 12-0408; 12-0409; 13-0174; 13-0200; 06-0126; 12-0027; 04-0170; 04-0171; 04-0172; 04-0173; 04-0174; 04-0532; 04-0533; 04-0546; 05-0295; 05-0296; and 05-0632.

2013-1568

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ROCHE VITAMINS, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Appeal from the United States Court of International Trade in case no. 04-CV-0175, Judge Richard K. Eaton.

BRIEF FOR DEFENDANT-APPELLANT UNITED STATES

## STATEMENT OF JURISDICTION

The United States appeals a final judgment of the United States Court of International Trade.  A10-11.  Plaintiff-appellee, Roche Vitamins, Inc. (Roche), asserted that the United States Court of International Trade possessed exclusive jurisdiction, pursuant to 28 U.S.C. § 1581(a), to entertain its claims.  Pursuant to 28 U.S.C. § 1295(a)(5), this Court possesses exclusive jurisdiction to review the trial court's final judgment.

Our appeal is timely. The trial court entered final judgment on June 28, 2013. A10-11, 77. We filed a notice of appeal on August 12, 2013, which was within 60 days of the final judgment below. A77; *see* Fed. R. App. P. 4. Our appeal was docketed on August 15, 2013. A77-78.

## STATEMENT OF THE ISSUE

Whether the Court of International Trade erred as a matter of law in ruling that "BetaTab 20%," a mixture of beta-carotene, antioxidants, gelatin, sucrose, and corn starch, is classifiable under Heading 2936 of the Harmonized Tariff Schedule of the United States (HTSUS), which excludes products that have undergone processing that renders them suitable for a specific use.

## STATEMENT OF THE CASE

The United States appeals the Court of International Trade's final judgment, issued after trial, because, when the HTSUS is properly construed, the trial court's own findings of fact disqualify BetaTab 20% from classification under Chapter 29 of the HTSUS. *See Roche Vitamins, Inc. v. United States* (*Roche III*), 922 F. Supp. 2d 1353 (Ct. Int'l Trade 2013) (Eaton, J.) (A12-30). Unless the trial court's misinterpretation of critical language in Chapter 29, which appears also in Chapter 28, is corrected, the United States could be deprived of more than $12 million in duties based on entries in current cases alone.

2

This appeal concerns the nature of the products covered under Chapter 29 of the HTSUS. Chapter 29, as well as Chapter 28, cover natural or synthetic chemical compounds. *See* A319-42. Both of these chapters allow additives to the covered raw compounds, but within limits. We focus on those limits here – that is, the additives to or a level of processing of raw compounds that exceed the limits so as to disqualify classification under Chapter 29.

The raw material in BetaTab 20% is beta-carotene crystalline, which has multiple general uses. The raw chemical material can be used as provitamin A for specific therapy, in multivitamin preparations or food and feed supplementation; as a colorant for food and pharmaceutical preparations; as an ultraviolet ray blocker in sunscreen products; and as an antioxidant in diverse preparations.[1] A356, 359, 362, 364, 578-79, 710, 715. To be eligible for classification in Chapter 29, the raw beta-carotene crystalline material may contain additives and undergo processing, but only within the limits described in the statutory Chapter Notes. A327.

---

1    A provitamin is "'[a] substance which is converted into a vitamin within an organism.'" *Roche III*, 922 F. Supp. 2d at 1357, n.3 (quoting Oxford English Dictionary 721 (2d ed. 1989)) (A16). It is also defined as "'[a] vitamin precursor that the body converts to its active form through normal metabolic processes. Carotene, for example, is a provitamin of vitamin A.'" *Id.* at 1357-58, n.3 (quoting American Heritage Dictionary of the English Language 1412 (4th ed. 2000)) (A16).

3

BetaTab 20% is the product of significant processing and additives.  Note 1 to Chapter 29 and Explanatory Note 29.36 establish that the processing and additives to BetaTab 20% are substantial and thus foreclose classification under Chapter 29.  BetaTab 20% is processed to a degree that it is fit for specific use as a nutritional ingredient for use in vitamin tablets and capsules.  The trial court's own findings of fact compel this conclusion.

In *Roche Vitamins, Inc. v. United States* (*Roche I*), 750 F. Supp. 2d 1367 (Ct. Int'l Trade 2010) (Wallach, J.) (A31-53), the trial court correctly denied Roche's motion for summary judgment, holding that the Government had "created a genuine issue whether the BetaTab 20% ingredients 'render it particularly suitable for specific use,' Gen. EN 29.36(d), namely 'in making tablet or capsule forms of dietary or nutritional supplements[,]'" which would disqualify BetaTab 20% from classification under Chapter 29.  *Id*. at 1380 (A50); *see also id*. at 1382 (A52).[2] And, after trial before a different Judge of the Court of International Trade, the court found, as fact, that the BetaTab 20% ingredients do, indeed, render BetaTab 20% particularly suitable for the specific use of making tablet or capsule forms of

---

2    We refer to the trial court's decision following trial as *Roche III* because, in 2011, the trial court published a decision denying a procedural motion by Roche. *See Roche Vitamins, Inc. v. United States* (*Roche II*), 791 F. Supp. 2d 1315 (Ct. Int'l Trade 2011) (Wallach, J) .

4

dietary or nutritional supplements. *See Roche III*, 922 F. Supp. 2d at 1361 (A22) ("[t]he high concentration and high bioavailability of beta-carotene in the merchandise mak[e] it preferable for use in dietary supplement tablets.") (citing A301-02); *see also id.* ("In most cases, a higher potency beta-carotene product is preferred for the manufacture of tablets in the dietary supplement industry.") (citing A162); *id.* ("Moreover, the merchandise was developed by Roche specifically 'for use in high potency and anti-oxidative vitamin tablets.'") (quoting A196). And, in fact, as the trial court found, Roche marketed BetaTab 20% as "tablet grade" and targeted BetaTab 20% for sale in the recognized market for direct compression tablets and capsules. *Id.* at 1362 (quoting A259, 285) (A23).

But the trial court departed from the legal reasoning supporting its earlier denial of summary judgment, and, using a materially different interpretation of the statutory and explanatory notes to Chapter 29, it held that, even though BetaTab 20% contains added ingredients that make it highly suitable for tableting, BetaTab 20%'s enhanced suitability for tableting does not render it *unsuitable* for its ordinary uses as a provitamin. *Roche III*, 922 F. Supp. 2d at 1362-63 (A24-25). The trial court reasoned that the statutory exclusion in Note 1 to Chapter 29 did not apply to BetaTab 20%, thus allowing its classification under Heading 2936 of Chapter 29 of the HTSUS.

5

As we demonstrate below, nothing in the text of the statutory or explanatory notes to Chapter 29 supports the trial court's new interpretation that a "specific use" disqualifying classification under Chapter 29 must necessarily be "a use that is *not an ordinary use of* chemicals of the heading[.]" *Roche III*, 922 F. Supp. 2d at 1359 (A18) (emphasis in original). By applying this new limitation on the statutory exclusions to classification of merchandise under Chapter 29, the trial court committed reversible error.

## STATEMENT OF FACTS

### I. Administrative Proceeding

In late 2002, Roche imported BetaTab 20%, a powder, the individual particles of which are formed by processing to contain a finely-dispersed solution of beta-carotene in a cornstarch-coated matrix of gelatin and sucrose, with antioxidants also present, in the shape of submicron beadlets. *Roche I*, 750 F. Supp. 2d at 1370 (A33); *Roche III*, 922 F. Supp. 2d at 1361 (A21-22) (citing A86). BetaTab 20% can be used as a source of vitamin A in foods, beverages, and vitamin products, or as a colorant. *Roche III*, 922 F. Supp. 2d at 1361 (A22).

Beta-carotene "must be processed and combined with other ingredients to be commercially usable as either a provitamin or a colorant." *Roche III*, 922 F. Supp. 2d at 1362 (A24) (citing A85). BetaTab 20%, in turn, is "essentially a bulk beta-

6

carotene ingredient" that has "increased suitability to be used in the creation of tablets for retail sale." *Id.* at 1363 (A25). Roche's customers perform the actual tableting process that transforms BetaTab 20% into dietary and nutritional supplements that are sold to consumers. *Id.* U.S. Customs and Border Protection (Customs) classified BetaTab 20% under the 2002 HTSUS subheading 2106.90.97, which provides, in relevant part, "Food preparations not elsewhere specified or included." *Id.* at 1356 (A13) (citing A84).

Roche filed a protest with Customs in March 2004, arguing that BetaTab 20% was properly classifiable at a lower duty rate as a colorant under HTSUS subheading 3204.19.35. *Roche I*, 750 F. Supp. 2d at 1370 (A33); *Roche III*, 922 F.3d at 1356 (A13). Roche alternatively urged duty-free classification under subheading K3204.19.35, as a product listed in the Pharmaceutical Appendix, or as "provitamins, unmixed" or "provitamins, other" under HTSUS subheading 2936.10.00 or subheading 2936.90.00, respectively. *Id.* Customs denied the protest in April 2004, referring to its determinations for beta-carotene products other than BetaTab 20%. *Roche I*, 750 F. Supp. 2d at 1370 (A33); *id.* at 1373 n.4 (A37 n.4).

7

## II.     <u>Course Of Proceedings Below</u>

After bringing an action in the Court of International Trade pursuant to 28 U.S.C. § 1581(a), Roche filed a motion for summary judgment, contending that, as a matter of law, BetaTab 20% should be classified under the HTSUS heading for synthetic organic coloring matter, or, in the alternative, under the HTSUS heading for provitamins and vitamins.  *Roche I*, 750 F. Supp. 2d 1367 (A31-54).  The trial court denied Roche's motion for summary judgment based on genuine issues of material fact as to both proposed classifications.  *Id.* at 1373-82 (A38-53) (Wallach, J.).

Specifically regarding Roche's alternative request for summary judgment on its claim that BetaTab 20% should be classified as "[p]rovitamins and vitamins, natural or reproduced by synthesis . . . whether or not in any solvent" under Heading 2936 of the HTSUS, the trial court in *Roche I* explained that "HTSUS Chapter 29 Note 1 establishes that Chapter 29 covers basic chemicals accompanied only by limited additions."  *Id*. at 1379 (A48).  After defining a "stabilizer" as "[a]ny substance that tends to maintain the physical and chemical properties of a material," *id.* (quoting McGraw-Hill Dictionary of Scientific and Technical Terms 2011 (6th ed. 2002)) (A48), the trial court explained that Explanatory Note 29.36(d) provides "guidance on the acceptable stabilizers[.]"  *Id*.  The trial court

8

specifically emphasized that a permissible stabilizer for purposes of Explanatory Note 29.36(d) '"*does not* alter the character of the basic product and *render it particularly suitable for specific use rather than for general use.*"' *Id.* (quoting Gen. EN 29.36(d)) (emphasis added by trial court).

In denying Roche's motion for summary judgment, the trial court held that the Government had "created a genuine issue whether the BetaTab 20% ingredients 'render it particularly suitable for specific use,' Gen. EN 29.36(d), namely 'in making tablet or capsule forms of dietary or nutritional supplements[.]'" *Id.* at 1380 (citation omitted) (A50). Reasoning that "this 'specific use' contrasts with the 'general use' of BetaTab 20% providing beta-carotene/provitamin A content and antioxidant activity," the trial court held that the Government's expert testimony "supports BetaTab 20%'s exclusion from Heading 2936 because the stabilizing ingredients make it suited for a specific purpose 'rather than for general use.'" *Id.* at 1380-81 (citing Gen. EN 29.36(d)) (A50). The trial court observed that it was undisputed that BetaTab 20% "must be 'combined with tableting excipients . . . to be formed into a tablet,'" but concluded that "there is a genuine issue whether the stabilizing ingredients further render BetaTab 20% 'particularly suitable for specific use rather than for general use.'" *Id.* at 1382 (quoting Gen. EN 29.36(d)) (A52).

9

After trial conducted by a different trial judge, the Court of International Trade rejected Roche's principal argument, holding that BetaTab 20% "is principally used [as] a source of provitamin A in foods or vitamin products, rather than as a 'coloring matter'" and therefore was not classifiable under Heading 3204. *Roche III*, 922 F. Supp. 2d at 1363 (A26) (Eaton, J.).

But the trial court did accept Roche's alternative argument that BetaTab 20% is classifiable as unmixed provitamins under subheading 2936, which covers: "Provitamins and vitamins, natural or reproduced by synthesis (including natural concentrates), derivatives thereof used primarily as vitamins, and intermixtures of the foregoing, whether or not in any solvent." *Id.* at 1363-64 n.7 (A27). In making this holding, the trial court had to interpret Note 1 to Chapter 29, which provides as follows:

> Except where the context otherwise requires, the headings of this Chapter apply only to:
>
>       \*          \*          \*
>
> (c) The products of headings 29.36 to 29.39 or the sugar ethers, sugar acetals and sugar esters, and their salts, of heading 29.40, or the products of heading 29.41, whether or not chemically defined;
>
>       \*          \*          \*
>
> (f) The products mentioned in (a), (b), (c), (d) or (e)

10

above with an added stabiliser (including an anticaking agent) necessary for their preservation or transport;

(g) The products mentioned in (a), (b), (c), (d), (e) or (f) above with an added anti-dusting agent or a colouring or odoriferous substance added to facilitate their identification or for safety reasons, provided that the additions do not render the product particularly suitable for specific use rather than for general use[.]

A327; *see Roche III*, 922 F. Supp. 2d at 1358-59 (A17-19). The trial court also

relied expressly on Explanatory Note 29.36, which provides as follows:

> This heading [2936] includes:
> (a) **Provitamins and vitamins, whether natural or reproduced by synthesis, and derivatives thereof used primarily as vitamins.**
> …
> (d) … The products of this heading may be stabilised for the purposes of preservation or transport:
> - by adding anti-oxidants,
> - by adding anti-caking agency (e.g., carbohydrates),
> - by coating with appropriate substance (e.g., gelatin, waxes or fats), whether or not plasticized
> - by adsorbing on appropriate substances e.g., silicic acid),
>
> **provided** that the quantity [of stabilizer] added or the processing in no case exceeds that necessary for their preservation or transport and that the addition or processing does not alter the character of the basic product and render it particularly suitable for specific use rather than for general use.

11

A336 (emphasis in original); *see Roche III*, 922 F. Supp. 2d at 1358

(A17-18).

The trial court interpreted the phrase "particularly suitable for specific use

rather than for general use" as meaning "(1) the ingredients added to it facilitate

uses not ordinary to goods of the heading or (2) where the added ingredients alter

the chemical's reactive properties in a manner that excludes uses ordinary to goods

of the heading." *Id*. at 1359 (citing *Degussa Corp. v. United States*, 508 F.3d

1044, 1046 (Fed. Cir. 2007)) (A18).  In its view, "a product's increased suitability

for an *ordinary* application of its chemical component will not exclude it from

Chapter 29, so long as the product can still be used as that chemical in other

ordinary ways." *Id*. (emphasis in original).  The trial court concluded that "[a]dded

ingredients that make a chemical highly capable of a use that is *not an ordinary use*

*of* chemicals of the heading, however, will render the item 'particularly suitable for

specific use rather than for general use' and exclude it from classification in the

headings of Chapter 29." *Id*. (emphasis in original).

In the conclusions of law section of its opinion, the trial court stated that "[i]t

was demonstrated as a matter of fact at trial that the BetaTab [20%]'s additional

non-beta-carotene ingredients, added as stabilizers, do not make the merchandise

particularly suitable for specific use." *Id*. at 1363 (A27).  The trial court further

12

concluded that "the addition of the stabilizing ingredients is permissible under note

1(f) to Chapter 29, and does not exclude the merchandise from classification under

Heading 2936." *Id.* at 1364 (A27). Because it held BetaTab 20% to be

'"elsewhere included'" in the HTSUS, the court rejected Customs' classification of

BetaTab 20% in a "basket" provision for food preparations, not elsewhere

specified or included (Heading 2106). *Id.*

This appeal followed.

## SUMMARY OF ARGUMENT

The trial court's reading of Note 1 to Chapter 29 of the HTSUS is

incompatible with the reasoning used by another trial judge to deny Roche's

summary judgment, and, more importantly, unsupported by any text or authority.

Chapter 29 covers basic chemicals, by themselves or with only limited additions.

Stabilizers are permitted only to the extent they are necessary to preserve or

transport the compound. A stabilizer, by definition, is a substance that tends to

maintain the physical and chemical properties of a material. A product with an

added stabilizer may be classified under Chapter 29 so long as the added stabilizer

does not alter its basic character and render it particularly suitable for a specific use

rather than for general use. In denying Roche's motion for summary judgment, the

trial court agreed that the Government had created a genuine issue of fact by

13

presenting an expert who would testify that Roche added stabilizers to BetaTab 20% that made it particularly suitable for tableting.  The trial court viewed this "specific use" as sufficient to remove BetaTab 20% from Chapter 29, if proven at trial.

At trial, we established, and a new trial judge found, that the stabilizers in BetaTab 20% render it particularly suitable for tableting.  But the trial court changed its interpretation of "specific use."  The trial court suddenly, without textual or precedential support, viewed the limitation on permissible stabilizers to apply only to those stabilizers that render the product particularly suitable for an *extraordinary* use.  Nothing in the text of the applicable statutory and explanatory notes suggests that a product's "specific use" cannot be one of the product's ordinary uses.  The trial court's conclusion is also inconsistent with this Court's precedent.  By dramatically curtailing the effect of the "specific use" limitation on permissible stabilizers in Chapter 29, without logical or textual basis or support in precedent, the trial court committed reversible error.

## ARGUMENT

## I.    Standard Of Review

In an appeal of a classification judgment entered after trial, the Court "first construe[s] the relevant classification headings," which the Court "review[s]

without deference to the trial court." *Bradford Indus., Inc. v. United States*, 152 F.3d 1339, 1341 (Fed. Cir. 1998); *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998). The Court then determines "under which of the properly construed tariff terms the merchandise at issue falls, a factual inquiry which [the Court] review[s] for clear error." *Bradford,* 152 F.3d at 1341 (citing *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1364-65 (Fed. Cir. 1998)). As we demonstrate below, the trial court's factual findings, when applied to properly construed tariff terms, support Customs' classification of BetaTab 20% in heading 2106, a basket provision for food preparations, not elsewhere specified or included.

## II.  The Trial Court Erred As A Matter Of Law By Adding A "Not An Ordinary Use" Requirement To The Exclusions Of Goods Classifiable Under Chapter 29

The trial court committed legal error by misconstruing the prohibitions contained in Note 1 to Chapter 29 to contain limitations that simply do not exist in the text or anywhere else. Absent reversal, the trial court's erroneous legal interpretation of Note 1 could lead to the improper classification of numerous imported goods in either Chapter 28 or Chapter 29, with lower duties, as the same limiting language contained in Note 1 to Chapter 29 that the trial court misconstrued appears in Note 1 to Chapter 28, HTSUS, as well.

15

HTSUS General Rule of Interpretation 1 provides that classification is "'determined according to the terms of any headings and any relative section or chapter notes[.]'" *Degussa Corp. v. United States,* 508 F.3d 1044, 1047 (Fed. Cir. 2007). Explanatory Notes or ENs "are not legally binding but may be consulted for guidance and are generally indicative of the proper interpretation of a tariff provision." *Degussa,* 508 F.3d at 1047. Here, all of these authorities support Customs' classification of BetaTab 20%.

## A. The Trial Court's Interpretation Of "Specific Use" Is Contrary To The Text Of Note 1 To Chapter 29

Note 1 to Chapter 29 limits the products that are classifiable in that chapter to basic compounds and certain limited mixtures whose processing has not rendered them particularly suitable for a specific use. After conducting a trial, the trial court found as fact that "[t]he high concentration and high bioavailability of beta-carotene in the merchandise mak[e] it preferable for use in dietary supplement tablets." *Roche III*, 922 F. Supp. 2d at 1361 (A22) (citing A301-02); *see also id.* ("In most cases, a higher potency beta-carotene product is preferred for the manufacture of tablets in the dietary supplement industry.") (citing A162); *id.* ("Moreover, the merchandise was developed by Roche specifically 'for use in high potency and anti-oxidative vitamin tablets.'") (quoting A196). Thus, the

16

transformation of water-insoluble beta-carotene crystalline material into water-miscible, and absorbable submicron beadlets specifically for use in tablets enhanced the use of beta-carotene by making BetaTab 20% specifically suitable for tableting.

These factual findings, which the trial court made after trial, should have led to a holding that BetaTab 20% falls outside the limited exceptions for use of stabilizers provided by Note 1. But the trial court here misinterpreted Note 1 to *expand* the limits of goods permissibly classifiable under Heading 2936.

Specifically, the trial court misconstrued the plain language of Note 1. Note 1(f) to Chapter 29 permits the addition of stabilizers *only* for preservation or transport, and if provitamins contain a stabilizer for any reason other than preservation or transport, Note 1 excludes them from classification in Chapter 29. Moreover, under Note 1(g), any provitamins that contain additives that "alter the character of the basic product and render [the product] particularly suitable for specific use rather than for general use" are excluded from classification in Heading 2936. *Roche I*, 750 F. Supp. 2d at 1379 (A51) (citing Gen. EN 29.36(d)). Thus, Chapter 29 products may not undergo processing (including the addition of other substances) that would make them "particularly suitable" for a specific use.

Although not binding, the Explanatory Notes to Chapter 29 Note 1 support this reading of the statutory note. Chapter Note 1(f), which requires that a product's added stabilizer be "necessary for [the product's] preservation or transportation," does not contain the "particularly suitable" language that is found in Chapter Notes 1(e) and 1(g). The Explanatory Note to heading 2936, however, extends to Chapter Note 1(f) the "particularly suitable" language. A336. The trial court explicitly relied on Explanatory Note 29.36 in its interpretation of Note 1 to Chapter 29. *Roche III,* 922 F.3d at 1358 (quoting Explanatory Notes to the Harmonized Commodity Description and Coding System 29.39 (3d ed. 2002)) (A17-18).

Explanatory Note 29.36 simply defines permissible and impermissible stabilizers. A permissible stabilizer is one that is necessary to preserve or transport the product so long as its addition or processing "does not alter the character of the basic product and render it particularly suitable for specific use rather than for general use." A336. An impermissible stabilizer is one that falls outside of this definition. Here, the trial court found that BetaTab 20% is a "water miscible version of provitamin A," altered by the added ingredients and processing to reduce the water-insolubility of beta-carotene. *Roche III*, 922 F. Supp. 2d at 1361 (A22) (citing A307). Under the Explanatory Note for Chapter 28 Note 1, an

18

addition of water-repellants would exclude classification in that chapter because "such agents modify the original characteristics of the products." A323. Under Explanatory Note 29.36, therefore the trial court's finding that the added stabilizers render BetaTab 20% miscible necessarily altered the beta-carotene's character for purposes of Chapter 29. Similarly, the trial court found that the ingredients added to create BetaTab 20% made it particularly suitable for tableting, *see Roche III*, 922 F. Supp. 2d at 1361-62 (A22), a "specific use" rather than a "general use." Therefore the stabilizers added to produce BetaTab 20% are impermissible stabilizers, disqualifying BetaTab 20% from classification under Chapter 29.

The "particularly suitable for specific use" language is also located in the Explanatory Note to Chapter 28 Note 1. A323. The Explanatory Note to Chapter 29 Note 1 adopted the "particularly suitable for specific use" language from the Chapter 28 Explanatory Note. A329 ("The provisions in the General Explanatory Note to Chapter 28 concerning the addition of stabilisers, antidusting agents and colouring substances apply, *mutatis mutandis*, to the chemical compounds of [Chapter 29].").

Below, the trial court relied on the "particularly suitable for specific use" language in the Explanatory Note to Heading 2936. *Roche III*, 922 F.3d at 1358 (A17-18). The language in Explanatory Note 29.36 is virtually identical to the

19

language in the Chapter 28 Explanatory Note, and any differences in the language would be necessary given the different context. *Compare* A336 *with* A323. The "particularly suitable for specific use" language, therefore, is not a provitamin-specific limitation.

Just as Explanatory Note 29.36 defines permissible and impermissible stabilizers, in *Degussa*, this Court explained that the Explanatory Note to Chapter 28, relevant in that case, "simply defines permissible and impermissible impurities[.]" 508 F.3d at 1049. In *Degussa*, the Court considered a Chapter Note that said that the headings within Chapter 28 applied to separate chemically defined compounds "'whether or not containing impurities[.]'" *Id*. at 1047 (quoting Chapter 28 Note 1(a)). The Explanatory Note, in turn, stated that "not all impurities in a compound qualify as impurities impermissible within the meaning of Chapter Note 1(a)." *Id*. The Court rejected Degussa's argument that the distinction between permissible and impermissible impurities in the Explanatory Note improperly narrowed the scope of Chapter 28 Note 1(a). *Id*. at 1048.

Indeed, Explanatory Note 29.36 generally supports the Government's reading of Note 1 to Chapter 29. For example, it states that products under Heading 2936 may contain impurities as long as the impurities occur during the manufacturing process, are not separately added and are not left in the product to

20

make it particularly suitable for specific use rather than for general use, such as

"improving" its "suitability as a solvent." A329. It also provides, as noted above,

that the vitamins and provitamins in Heading 2936 may be stabilized for purposes

of preservation or transport by various means "provided that the quantity added *or*

*the processing* in no case exceeds that necessary for their preservation or transport

and that the addition *or processing* does not alter the character of the basic product

and render it particular[l]y suitable for specific use rather than for general use."

A329, 336 (emphasis added).

Explanatory Note 29.36 thus clarifies that certain processing plays a role in

determining whether the product is suitable for a specific use. Processing will

preclude a product from classification in Chapter 29 if the processing changes the

product's character to render it "particularly suitable" for a specific use. The trial

court overlooked its own findings that the highly-processed nature of BetaTab 20%

made it particularly suited for the specific use of making a tablet or capsule form of

dietary or nutritional supplements. *See Roche III*, 922 F. Supp. 2d at 1360-61

(A21-22). The trial court also ignored that BetaTab 20% contains additives that

are not used solely for stabilizing and preserving, but also impart qualities that

allow the BetaTab 20% to be suitable for use in making tablets or capsules. *See id.*

The trial court erroneously read the exclusionary language "particularly suitable for specific use" to mean particularly suitable for a specific use outside the ordinary use of a chemical under Chapter 29. *Roche III*, 922 F. Supp. 2d at 1359 (A18-19). The trial court equated the term "specific" with the extraordinary or atypical, but the statutory language "suitable for specific use" contains no qualifier tying the specific use to a use outside the ordinary use of a chemical of the heading under review. Thus, when the trial court stated that "as a matter of fact" the additional non-beta-carotene ingredients "do not make the merchandise particularly suitable for specific use," *id*. at 1363 (A27), the trial court injected its misinterpretation of "specific use" into this arguable finding of fact.

This legal error is highlighted in the trial court's explicitly factual finding that BetaTab 20%'s "increased suitability to be used in the creation of tablets for retail sale is a particular kind of use within the uses common to members of the provitamin category." *Id*. at 1363 (A25). That is, the trial court found as a factual matter that increased suitability for tableting is indeed a specific use, but, based on its misinterpretation of Note 1, it held that this "particular kind of use" was not a specific use for purposes of Note 1 to Chapter 29. *See id*. at 1359, 1363 (A18-19, 25). Nothing in the text of Note 1 or Explanatory Note 29.36 suggests, much less requires, the type of "common use" distinction discerned by the trial court. There

22

is simply no textual or any other support for the trial court's expansion of the scope of Chapter 29. If anything, the Explanatory Notes to Heading 2936 suggest that even certain common uses of certain provitamins A are *excluded* from classification under Chapter 29. *See, e.g.,* A342 (Explanatory Note 29.36 (6) ("The heading **excludes**: . . . (6) Provitamins A (α-, β- and γ-carotenes and cryptoxanthin) because of their use as colouring substances (**heading 32.03 or 32.04**)." (emphasis in original).

Absent reversal, the trial court's application of Note 1 would create a standard that impermissibly disregards impurities or additives, regardless of whether the additions are limited to the types permitted by Note 1, such as stabilizers used only for preservation or transport, as long as the chemical product is able to be used as that particular chemical. This is an unjustifiable expansion of the scope of merchandise that could be classifiable under Chapter 29, and, by extension, Chapter 28.

## B. The Trial Court's Interpretation Of "Specific Use" Is Inconsistent With This Court's Precedent

As a general matter, the trial court's interpretation of Note 1 is at odds with this Court's precedent in *Degussa*. Although the trial court cited *Degussa* for a narrow proposition, *see Roche III*, 922 F. Supp. 2d at 1359 (A18), its reasoning is

inconsistent with this Court's logic in that case.  In *Degussa*, the Court considered the language "particularly suitable for specific use rather than for a general use" contained in Note 1 to Chapter 28 (which is virtually identical to Note 1 to Chapter 29 for present purposes).  In that case, the Government successfully appealed the Court of International Trade's judgment that impermissible impurities did not foreclose classification of surface-modified silicone dioxide products under Chapter 28.  The Court held that the processing of imported surface modified silica impermissibly changed the surface properties of the silica from hydrophilic to hydrophobic, because it allowed the particles of the import "to be incorporated into certain organic solvents and polymers faster and easier than hydrophilic [particles]."  *Degussa*, 508 F.3d at 1046.  The Court agreed with our position that "this transformation renders the product suitable for specific use (namely, uses requiring a hydrophobic attribute-water-repellent)."  *Id*. at 1049.

Notably, the Court in *Degussa* did *not* hold that impermissible additions or processing must facilitate a use not ordinary to the goods, or alter the chemical properties to the point at which the ordinary use of the goods is changed or excluded.  Rather, the Court in *Degussa* explicitly held that the change in surface properties made incorporation into certain solvents "faster and easier," *id*. at 1047, and that this facilitation was a prohibited operation because it made the product

24

more suitable for a specific use.  *Id.* at 1049.  A proper application of the reasoning in *Degussa* would foreclose classification of BetaTab 20% in Chapter 29, supporting reversal of the trial court's judgment in this appeal.

## **CONCLUSION**

For these reasons, we respectfully request this Court to reverse the judgment of the trial court with regard to the merchandise in dispute.  In the alternative, we request the Court to vacate the judgment below and remand for further factual findings consistent with a proper interpretation of Note 1 to Chapter 29.

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

s/Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

OF COUNSEL:

s/Patricia M. McCarthy

EDWARD N. MAURER
SHERYL A. FRENCH
Office of Assistant Chief Counsel
International Trade Litigation
U.S. Customs & Border Protection
New York, New York

PATRICIA M. McCARTHY
Assistant Director
Commercial Litigation Branch
Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel. (202) 307-0164
Fax (202) 514-7969
patricia.mccarthy@usdoj.gov

February 18, 2014

Attorneys for Defendant-Appellant

25

# ADDENDUM

# INDEX TO THE ADDENDUM

**Document**                                                                 **Page**

Summary Judgment Opinion, *Roche Vitamins Inc. v. United States*,
750 F. Supp. 2d 1367 (CIT 2010)....................................................... 1

Trial Opinion, *Roche Vitamins Inc. v. United States*,
922 F. Supp. 2d 1353 (CIT 2013)..................................................... 17

**ROCHE VITAMINS, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Slip Op. 10–140.**
**Court No. 04–00175.**

United States Court of
International Trade.

Dec. 23, 2010.

**Background:** Importer filed suit challenging Customs and Border Protection's (CBP) classification, under Harmonized Tariff Schedule of the United States (HTSUS), of merchandise containing beta carotene, an organic colorant with provitamin A activity. Importer moved for summary judgment.

**Holdings:** The Court of International Trade, Wallach, J., held that:

(1) fact issues precluded summary judgment as to classification under HTSUS heading for synthetic organic coloring matter, and

(2) fact issues precluded summary judgment as to classification under HTSUS heading for provitamins and vitamins.

Motion denied.

**1. Customs Duties ⟺17**

The proper classification of merchandise, under the Harmonized Tariff Schedule of the United States (HTSUS), is ultimately a question of law. Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**2. Customs Duties ⟺84(6)**

Court of International Trade has an independent duty to reach the correct result in cases challenging classification of imported merchandise, under the Harmonized Tariff Schedule of the United States (HTSUS). Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**3. Customs Duties ⟺17**

In a classification case, under the Harmonized Tariff Schedule of the United States (HTSUS), Court of International Trade construes the relevant competing classification headings, which is a question of law, determines what the merchandise at issue is, which is a question of fact, and then determines the proper classification under which the merchandise falls, the ultimate question in every classification case and one that has always been treated as a question of law. Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**4. Customs Duties ⟺84(8.1)**

On a motion for summary judgment, Court of International Trade may not resolve or try factual issues. U.S.Ct.Int. Trade Rule 56(c), 28 U.S.C.A.

**5. Customs Duties ⟺84(8.1)**

Summary judgment in a classification case, under the Harmonized Tariff Schedule of the United States (HTSUS), is appropriate only if the material facts of what the merchandise is and what it does are not at issue. Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.; U.S.Ct.Int. Trade Rule 56(c), 28 U.S.C.A.

**6. Customs Duties ⟺17, 84(6)**

Court of International Trade determines de novo the proper classification of merchandise, under the Harmonized Tariff Schedule of the United States (HTSUS), by applying the HTSUS General Rules of Interpretation (GRIs) in numerical order, as well as the HTSUS Additional Rules of Interpretation (ARI). Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**7. Customs Duties ⟺17, 18**

Absent contrary legislative intent, Harmonized Tariff Schedule of the United States (HTSUS) terms are to be construed according to their common and commercial meanings, which are presumed to be the same. Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**8. Customs Duties ⟺17**

To assist in ascertaining the common meaning of a tariff term, under the Harmonized Tariff Schedule of the United States (HTSUS), Court of International Trade may rely on its own understanding of the terms used and may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources. Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**9. Customs Duties ⟺17**

Although not dispositive, the Explanatory Notes (ENs) maintained by the Harmonized System Committee of the World Customs Organization clarify the scope of the subheadings under the Harmonized Tariff Schedule of the United States (HTSUS) and offer guidance in their interpretation. Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**10. Customs Duties ⟺84(6)**

Harmonized Tariff Schedule of the United States (HTSUS) classification decisions made by Customs and Border Protection (CBP) may be entitled to some weight in accordance with *Skidmore*, given the specialized experience and broader investigations and information available to the agency; however, the amount of respect afforded will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control. Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**11. Customs Duties ⟺19**

In the principal use analysis, under the Harmonized Tariff Schedule of the United States (HTSUS), Court of International Trade examines multiple factors that include: (1) the general physical characteristics of the merchandise, (2) the expectation of the ultimate purchasers, (3) the

channels of trade in which the merchandise moves, in other words, the environment of the sale, for example, the manner in which the merchandise is advertised and displayed, (4) the usage of the merchandise, (5) the economic practicality of so using the import, and (6) the recognition in the trade of this use. Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**12. Customs Duties ⟺17**

Under the Harmonized Tariff Schedule of the United States (HTSUS), a subheading term cannot be read into a heading term from which it is absent. Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**13. Customs Duties ⟺24(4)**

In importer's action challenging Customs and Border Protection's (CBP) classification, under Harmonized Tariff Schedule of the United States (HTSUS), of merchandise containing beta carotene, the term "coloring matter" in the HTSUS heading constituted principal use provision, triggering analysis of class or kind of goods to determine whether merchandise was member of that class, pursuant to HTSUS Additional Rules of Interpretation (ARI), since subheading term "beta carotene," explanatory notes (ENs), and K designation were not special language or context rendering ARI inapplicable to whether merchandise was encompassed by heading for synthetic organic coloring matter. Harmonized Tariff Schedule, HTSUS 3204.11.10 et seq.

**14. Customs Duties ⟺84(8.1)**

Genuine issues of material fact remained in principal use analysis as to whether importer's merchandise containing beta carotene belonged to class or kind of goods principally used as "coloring matter," within meaning of Harmonized Tariff Schedule of the United States (HTSUS), thus precluding summary judgment classifying merchandise under HTSUS heading

**Add. 2**

for synthetic organic coloring matter. Harmonized Tariff Schedule, HTSUS 3204.11.10 et seq.

**15. Customs Duties ⚙️84(8.1)**

Genuine issues of material fact remained as to whether stabilizing ingredients in importer's merchandise containing beta carotene rendered merchandise particularly suitable for specific use, namely in making tablet or capsule forms of dietary or nutritional supplements, rather than general use providing beta-carotene or provitamin A content and antioxidant activity, thus precluding summary judgment classifying merchandise under HTSUS heading for provitamins and vitamins. Harmonized Tariff Schedule, HTSUS 2936.21.00.

**Trademarks ⚙️1800**
BetaTab 20%.

**Trademarks ⚙️1800**
Lucarotin.

———

Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, New York City (Erik D. Smithweiss, Robert B. Silverman, and Joseph M. Spraragen) for Plaintiff Roche Vitamins, Inc.

Tony West, Assistant Attorney General; Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Saul Davis); and Sheryl A. French, Office of the Chief

Counsel for Import Administration, U.S. Department of Commerce, Of Counsel, for Defendant United States.

*OPINION*

WALLACH, Judge.

**I**

**INTRODUCTION**

This matter comes before the court on the Motion for Summary Judgment filed by Plaintiff Roche Vitamins, Inc. ("Roche") challenging the classification of merchandise by U.S. Customs and Border Protection ("Customs"). Jurisdiction exists pursuant to 28 U.S.C. § 1581(a). Because genuine issues of material fact affect the proper classification of Roche's imported merchandise, Roche's Motion for Summary Judgment is DENIED.

**II**

**BACKGROUND**

**A**

**The Imported Merchandise**

Beta-carotene is an organic colorant that has provitamin A activity. *See* Plaintiff's Statement of Material Facts Not In Dispute ("Roche's Facts") ¶¶ 8, 10, 32, 33; Defendant's Response to Plaintiff's Statement of Material Facts Not in Dispute ("Defendant's Factual Response")[1] ¶¶ 8, 10, 32, 33. Beta-carotene must be combined with other ingredients to be used as a colorant or provitamin A. *See* Roche's

---

1. Roche devotes much of its reply brief arguing that numerous statements in Roche's Facts should be "deemed admitted" pursuant to USCIT R. 56(h)(3) based on non-admissions contained in Defendant's Factual Response. *See* Plaintiff's Memorandum of Law in Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("Roche's Reply") at 10–15. Two such non-admissions appear devoid of the requisite "citation to evidence which would be admissi-

ble." USCIT R. 56(h)(4); *see* Roche's Reply at 13; Defendant's Factual Response ¶¶ 22, 23. For the remaining challenged non-admissions, Roche argues that Defendant's supporting evidence is inadequate. *See* Roche's Reply at 12–15; Defendant's Factual Response ¶¶ 15–17, 21, 25, 26, 29, 36. The court will not order any statements "deemed admitted" on the basis of argument in a reply brief; Roche may, if appropriate, file a motion seeking relief. *See* USCIT RR. 7(b), 37.

Facts ¶ 14; Defendant's Factual Response ¶ 14. As explained by Roche's expert, the imported merchandise sold under the trade name "BetaTab 20%" is a reddish brown/orange powder that "consists of 20% by weight synthetic beta-carotene crystalline." Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("Roche's Motion") Att. 2: Declaration of Jean Claude Tritsch ("Tritsch Decl.") ¶¶ 8, 9.

> The individual particles of the powder contain a finely dispersed solution of beta carotene in a cornstarch-coated matrix of gelatin and sucrose. Antioxidants are also present in the particles.... BetaTab 20% is produced by dissolving beta carotene crystalline powder in a solvent along with [two additional, stabilizing antioxidants]. Separately, gelatin, sucrose, and [a third stabilizing antioxidant] are dissolved in the water. The two solutions are blended together to produce an emulsion after which the solvent is distilled from the emulsion. The emulsion is then sprayed as droplets into corn starch. The resulting particles are dried, freed from excess corn starch and filled into containers. The particles are in the shape of microspheres, and are referred to as beadlets.

*Id.* ¶¶ 9, 10, 11.

"BetaTab 20% was developed, designed, and marketed as a source of beta-carotene for purposes of sale to makers of dietary supplements (tablets and capsules) who seek a high betacarotene/provitamin A content and antioxidant activity." Plaintiff's Response to Defendant's Statement of Material Facts as to Which There Is No Genuine Dispute ("Roche's Factual Response") ¶ 7; Defendant's Statement of Material Facts as to Which There Is No

Genuine Dispute ("Defendant's Facts") ¶ 7. "The Roche marketing materials for Beta-Tab 20% do not mention any intent or use ... as a food colorant.... Any colorant function in the actual use of BetaTab 20% is unintentional or ancillary." Defendant's Facts ¶ 8; Roche's Factual Response ¶ 8.

## B
## The Classification By Customs And This Litigation

BetaTab 20% was imported into the United States by Roche in December 2002 alongside another Roche product, "B–Carotene 7% CWS." Roche's Facts ¶¶ 1–3; Defendant's Factual Response ¶¶ 1–3. The CWS ("cold water soluble") designation does not apply to BetaTab 20% because it will normally disperse only in a heated solution. *See* Tritsch Decl. ¶ 16; Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment ("Defendant's Opposition") at 7. Customs classified BetaTab 20% under subheading 2106.90.97 of the Harmonized Tariff Schedule of the United States ("HTSUS") and assessed duties at the rate of 8.5% *ad valorem* plus 28.8 cents per kilogram. *See* Summons (April 23, 2004).

**[1, 2]** Roche filed a protest in March 2004 that was denied by Customs in April 2004. *See id.* Roche thereafter initiated this case. *See* Complaint (September 2, 2004). Roche alleged that both products should be classified under HTSUS subheading 3204.19.35 (normally dutiable at 3.1% *ad valorem),* *id.* ¶ 13, and eligible for duty-free entry pursuant to the HTSUS Pharmaceutical Appendix ("PA"), *id.* ¶ 16, or, alternatively, classified as duty-free under HTSUS Heading 2936, *id.* ¶ 19.[2] In 2009, Roche and Defendant United States

---

**2.** Although Roche initially sought, in the alternative, classification under HTSUS subheadings 2936. 10.00 or 2936.90.00, *see* Complaint ¶ 19, Roche now seeks summary judgment for

classification under HTSUS Chapter 29 pursuant only to subheading 2936.10.00. *See* Roche's Motion at 23–30; Defendant's Memorandum in Opposition to Plaintiff's Motion for

("Defendant") stipulated that B–Carotene 7% CWS "is classifiable ... under subheading 3204.19.35, HTSUS (2002)" and "request[ed] that when final judgment in this action is entered, reliquidation be ordered ... accordingly." November 13, 2009 Stipulation ¶¶ 3, 5.[3]

Roche now moves for summary judgment. See Roche's Motion. Defendant contends that the classification of BetaTab 20% under HTSUS subheading 2106.90.97

was proper, see Defendant's Opposition at 1–3, but if classification is found under Heading 3204, "then the merchandise is properly classifiable in subheading [3204.19.50], HTSUS, at a duty rate of [7.8%] ad valorem." Answer (November 15, 2004) ¶ 22; see Defendant's Opposition at 9.

HTSUS Headings 2106, 2936, and 3204 and the relevant subheadings provide as follows:

| | |
|---|---|
| 2106 | Food preparations not elsewhere specified or included: |
| .... | |
| 2106.90 | Other: .... |
| .... | |
| 2106.90.97 | Other: .... |
| .... | |
| 2936 | Provitamins and vitamins, natural or reproduced by synthesis (including natural concentrates), derivatives thereof used primarily as vitamins, and intermixtures of the foregoing, whether or not in any solvent: |
| 2936.10 | Provitamins, unmixed |
| .... | |
| 3204 | Synthetic organic coloring matter, whether or not chemically defined; preparations as specified in note 3 to this chapter based on synthetic coloring matter; .... |
| 3204.19 | Other, including mixtures of coloring matter of two or more of the subheadings 3204.11 to 3204.19: |
| 3204.19.35 | Beta-carotene and other carotenoid coloring matter |
| .... | |
| | Other: |
| 3204.19.40 | Products described in additional U.S. note 3 to section VI |
| .... | |
| 3204.19.50 | Other |
| .... | |

Heading 2106, HTSUS (2002); Heading 2946, HTSUS (2002); Heading 3204, HTSUS (2002).

The HTSUS provides that certain imported products are eligible for duty-free entry pursuant to the PA. "Whenever a rate of duty of 'Free' followed by the sym-

Summary Judgment at 2 n. 2 ("Defendant's Opposition"). Roche has not abandoned its claim under subheading 2936.90.00. See July 29, 2010 Oral Argument at 3:00–4:35.

**3.** Roche compares BetaTab 20% with B–Carotene 7% CWS to demonstrate that HTSUS subheading 3204.19.35 is the proper classification for both. See Roche's Motion at 3–4, 10–12. Argument based upon comparison between these products is premature because: B–Carotene 7% CWS has not yet been classi-

fied; the proper classification of merchandise is ultimately a question of law; and the court has an independent duty to reach the correct result in classification cases. See November 13, 2009 Stipulation; Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1366 (Fed.Cir. 1998); Jarvis Clark Co. v. United States, 733 F.2d 873, 878 (Fed.Cir.1984). Moreover, as Defendant informed the court at oral argument, B–Carotene 7% CWS is made for use as a colorant, in contrast to BetaTab 20%. See July 29, 2010 Oral Argument at 15:23–16:16.

bol 'K' in parentheses appears in the 'Special' subcolumn for a heading or subheading, any product (by whatever name known) ... shall be entered free of duty, *provided* that such product is included in the [PA]." Gen. Note 13, HTSUS (2002) (emphasis in original). The PA identifies "BETACAROTENE," [Chemical Abstracts Service Registry number] "7235–40–07." Pharmaceutical Appendix, HTSUS (2002), Table 1. Subheading 3204.19.35 includes the following special rate of duty: "Free (... K ...)." Subheading 3204.19.35, HTSUS (2002).

## III

### STANDARD OF DETERMINATION

**[3]** In a classification case, "the court construes the relevant (competing) classification headings, a question of law; determines what the merchandise at issue is, a question of fact; and then" determines "the proper classification under which [the merchandise] falls, the ultimate question in every classification case and one that has always been treated as a question of law." *Bausch & Lomb, Inc. v. United States,* 148 F.3d 1363, 1366 (Fed.Cir.1998).

**[4, 5]** The court will grant a motion for summary judgment "if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." USCIT R. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, this court "may not resolve or try factual issues." *Phone-Mate, Inc. v. United States,* 690 F.Supp. 1048, 12 CIT 575, 577 (1988), *aff'd,* 867 F.2d 1404 (Fed.Cir. 1989) (citation omitted). Accordingly, summary judgment in a classification case is appropriate only if "the material facts of what the merchandise is and what it does are not at issue." *Diachem Indus. Ltd. v.*

*United States,* 22 CIT 889, 892 (1998) (citation omitted).

**[6]** The court determines the proper classification *de novo* by applying the HTSUS General Rules of Interpretation ("GRIs") in numerical order, as well as the HTSUS Additional Rules of Interpretation ("ARI"). *See Faus Group, Inc. v. United States,* 581 F.3d 1369, 1372 (Fed.Cir.2009); *Carl Zeiss, Inc. v. United States,* 195 F.3d 1375, 1379 (Fed.Cir.1999); *Rollerblade, Inc. v. United States,* 112 F.3d 481, 483–84 (Fed.Cir.1997). The GRI 1 starting point provides in relevant part that, "for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes." GRI 1, HTSUS (2002).

**[7–9]** "Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same." *Carl Zeiss,* 195 F.3d at 1379 (citing *Simod Am. Corp. v. United States,* 872 F.2d 1572, 1576 (Fed.Cir.1989)). "To assist it in ascertaining the common meaning of a tariff term, the court may rely on its own understanding of the terms used and may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources." *Baxter Healthcare Corp. v. United States,* 182 F.3d 1333, 1337–38 (Fed.Cir.1999) (citation omitted). Although not dispositive, the Explanatory Notes ("EN") maintained by the Harmonized System Committee of the World Customs Organization "clarify the scope of the HTSUS subheadings and offer guidance in their interpretation." *Franklin v. United States,* 289 F.3d 753, 758 (Fed.Cir.2002) (citation omitted); *see* H.R. Conf. Rep. No. 100–576, 100th Cong., 2d Sess. 549 (1988) at 26–27, *reprinted in* 1988 U.S.C.C.A.N. 1547, 1582.

**[10]** Classification decisions made by Customs may be entitled to some weight in accordance with *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). Under *Skidmore,* "an agency's interpretation may merit some deference . . . given the 'specialized experience and broader investigations and information' available to the agency." *Mead Corp.,* 533 U.S. 218, 234, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (quoting *Skidmore,* 323 U.S. at 139, 65 S.Ct. 161). The amount of respect afforded "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161.[4]

## IV

### DISCUSSION

Roche's Motion for classification under HTSUS subheading 3204.19.35 is denied. *Infra,* Part IV.A. According to applicable precedent, *infra* Part IV.A.1, the Heading 3204 term "coloring matter" is a principal use provision in this action, *infra* Part IV.A.2. Genuine issues of material fact remain as to whether BetaTab 20% belongs to the class or kind of goods principally used as coloring matter. *Infra,* Part IV.A.3. Roche's Motion for duty-free eligibility under the PA and Defendant's requested alternate classification under subheading 3204.19.50 need not be resolved at this stage because they both depend upon the classification of BetaTab 20% under Heading 3204. *Infra,* Part IV.A.4. Roche is also not entitled to summary judgment for classification under HTSUS Heading 2936 because a genuine issue remains as to the

functionality of the BetaTab 20% ingredients. *Infra,* Part IV.B.

### A.

### Summary Judgment Is Not Appropriate To Classify BetaTab 20% Under Heading 3204

#### 1.

### Precedent Interpreting The Heading 3204 Term "Coloring Matter"

#### (a)

#### *E.M. Chems. v. United States*

This court has previously held that "the term 'coloring matter' in Heading 3204 is a principal use provision." *E.M. Chems. v. United States,* 20 CIT 382, 386, 923 F.Supp. 202 (1996) (denying summary judgment because of conflicting evidence as to the principal use of thermochromic liquid crystals). "The word 'coloring' acts as an adjective modifying the word 'matter' in a way that compels one to consider some aspect of use." *Id.* (internal quotations omitted). Federal Circuit precedent supported the principal use determination in *E.M. Chems. Id.* at 387, 923 F.Supp. 202 (citing *Stewart–Warner Corp. v. United States,* 748 F.2d 663, 667 (Fed.Cir.1984) (provision for "bicycle speedometers" controlled by "chief use" because " 'bicycle' [modifies] 'speedometer' in a way that implies use of the speedometer on a bicycle")). EN 32.04 also supported Heading 3204 being a principal use provision by stating "explicitly that 'substances which in practice *are not used* for their dying properties are excluded.' . . . A list of substances *that are used for purposes* other than coloring are excluded from the 'coloring matter' heading." *Id.* at 387, 923 F.Supp. 202 (citations omitted) (bolded em-

---

**4.** Defendant does not here seek deference for the denial of Roche's protest that only references Customs determinations for beta-carotene products other than BetaTab 20%. *See*

U.S. Customs and Border Protection, Protest No. 1101–04–100088 (April 6, 2004); Defendant's Opposition at 1–28.

phasis in original and underlined emphasis added).

This principal use designation triggers application of ARI 1(a) in the Heading 3204 classification analysis. *Id.* ARI 1 provides in relevant part as follows:

In the absence of special language or context which otherwise requires—(a) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use....

ARI 1, HTSUS (2002).

[11] In the "principal use" analysis, the court "must ascertain the class or kind of goods which are involved and decide whether the subject merchandise is a member of that class." *E.M. Chems.,* 923 F.Supp. 202, 20 CIT at 388. "The purpose of 'principal use' provisions in the HTSUS is to classify particular merchandise according to the ordinary use of such merchandise, even though particular imported goods *may be put to some atypical use." Primal Lite, Inc. v. United States,* 182 F.3d 1362, 1364 (Fed.Cir.1999) (emphasis added). The Federal Circuit describes ARI 1(a) as "call[ing] for a determination as to the group of goods that are commercially fungible with the imported goods." *Id.* at 1365. Traditionally, courts undertaking the principal use analysis examine multiple factors that include:

(1) the general physical characteristics of the merchandise;

(2) the expectation of the ultimate purchasers;

(3) the channels of trade in which the merchandise moves; the environment of the sale (e.g. the manner in which the merchandise is advertised and displayed);

(4) the usage of the merchandise;

(5) the economic practicality of so using the import; and

(6) the recognition in the trade of this use.

*E.M. Chems.,* 923 F.Supp. 202, 20 CIT at 388 (citing *United States v. Carborundum Co.,* 63 C.C.P.A. 98, 102, 536 F.2d 373 (1976) (subsequent history omitted)).

**(b)**

### *BASF v. United States*

After *E.M. Chems.,* this court conducted a trial to classify a beta-carotene product. *See BASF Corp. v. United States,* 29 CIT 681, 684, 391 F.Supp.2d 1246 (2005) ("*BASF I* "), *aff'd, BASF Corp. v. United States,* 482 F.3d 1324 (Fed.Cir.2007) ("*BASF II* "). The parties agreed that Lucarotin® 1% should be classified under HTSUS Heading 3204. *See BASF I,* 29 CIT at 682. This court classified Lucarotin® 1% under subheading 3204.19.35, as opposed to subsequent subheadings that cover "[o]ther." Subheading 3204.19.40, HTSUS (2002); subheading 3204.19.50, HTSUS (2002); *see BASF I,* 29 CIT at 681–82. This classification was affirmed by the Federal Circuit. *See BASF II,* 482 F.3d at 1326–27. Besides the 19 percentage-point difference in beta-carotene concentration, the following findings of fact from the *BASF I* trial distinguish Lucarotin® 1% from BetaTab 20%:

● "Lucarotin® 1% . . . is sold for use as a food colorant," *BASF I,* 29 CIT at 684;

● "Lucarotin® 1% . . . is used to impart color to a wide variety of foods," *id.;*

● "Customers do not buy Lucarotin® 1% for any purpose other than delivery of a beta-carotene colorant," *id.;* and

● "Lucarotin® 1% is marketed . . . for coloration," *id.* at 687.

In classifying Lucarotin® 1%, both this court and the Federal Circuit emphasized the product's purpose and intent. This

**Add. 8**

court concluded that "inclusion of the term 'matter' ... clearly contemplates that products within the scope of the subheading would be beta-carotene or other carotenoid colorants of a particular kind or for a particular purpose." *Id.* at 691. In affirming, the Federal Circuit explained "that this product is not intended for vitamin or other pharmaceutical use, but is intended for use as a food colorant." *BASF II*, 482 F.3d at 1326. The Federal Circuit further affirmed this court's determination that Lucarotin® 1% was not eligible for duty-free entry under the PA. *See BASF I*, 29 CIT at 692 n. 7; *BASF II*, 482 F.3d at 1327.

### 2.

### The Heading 3204 Term "Coloring Matter" Is A Principal Use Provision In This Action

Roche disputes the applicability of the *E.M. Chems.* holding that "the term 'coloring matter' in Heading 3204 is a principal use provision." *E.M. Chems.*, 923 F.Supp. 202, 20 CIT at 386; *see* Plaintiff's Supplemental Brief Pursuant to the Court's August 13, 2010 Order ("Roche's Supp. Brief") at 1–3. According to Roche, ARI 1(a) does not apply to the classification of BetaTab 20% because "of special language or context which otherwise requires." Roche's Supp. Brief at 3 (quoting ARI 1, HTSUS (2002)). In support of this argument, Roche cites subheading 3204.19.35, Chapter 29 Note 2(f), certain ENs, and the PA. *See id.* None of these, however, constitute "special language or context...." ARI 1, HTSUS (2002)

**[12, 13]** Roche first emphasizes that "beta carotene is *eo nomine* provided for in subheading 3204.19.35." Roche's Supp. Brief at 3. However, a subheading term cannot be read into a heading term from

which it is absent. *See JVC Co. of Am. v. United States*, 234 F.3d 1348, 1352 (Fed. Cir.2000) ("Only after determining that a product is classifiable under a particular heading should the court look to the subheadings to find the proper classification") (citation omitted). The subheading term "beta carotene" is therefore not "special language or context" rendering ARI 1(a) inapplicable to whether BetaTab 20% is encompassed by the term "[s]ynthetic organic coloring matter." Subheading 3204.19.35, HTSUS (2002); ARI 1, HTSUS (2002); Heading 3204, HTSUS (2002).

Roche next seeks support for its position from HTSUS Chapter 29 Note 2(f). *See* Roche's Supp. Brief at 3. That note provides that Chapter 29 "does not cover ... synthetic organic coloring matter ... (heading 3204)." Ch. 29 n. 2(f), HTSUS (2002). According to Roche, this note requires that any beta-carotene product "must be classified in heading 3204, regardless of its use for its provitamin A properties ... But for Note 2(f) to Chapter 29, beta-carotene would be classifiable under heading 2936 since it is provitamin A." Roche's Motion at 16, 19. However, this note does not preclude certain beta-carotene products from classification under, *inter alia*, Heading 2936, *see infra* Part IV.B, or a catchall HTSUS provision such as that used by Customs to classify BetaTab 20%, *see* Defendant's Opposition at 1–2. Note 2(f) only cross-references the term "coloring matter," which this court and the Federal Circuit have construed with an emphasis on the intended use and use of a product as coloring matter. *See BASF I*, 29 CIT at 691; *BASF II*, 482 F.3d at 1326–27.[5] Chapter 29 Note 2(f) is therefore not "special language or context" rendering ARI 1(a) inapplicable. ARI 1, HTSUS (2002).

---

**5.** Although these *BASF* statements were made in the context of HTSUS subheading 3204.19.35, they apply to Heading 3204 be-

cause of the common "coloring matter" language. Heading 3204, HTSUS (2002); subheading 3204.19.35, HTSUS (2002).

Roche also misplaces reliance on the ENs. EN 32.04 provides that: "Substances which in practice *are not used* for their dyeing properties are **excluded**." EN 32.04(I) (bolded emphasis in original and underlined emphasis added);[6] *see supra* Part IV.A. 1(a) (discussing the role of EN 32.04 in *E.M. Chems.*, 923 F.Supp. 202, 20 CIT at 387). The EN to Heading 2936 "**excludes:** . . . Provitamins A (α-, β- and γ-carotenes . . .) because of their *use* as colouring substances." EN 29.36 (bolded emphasis in original and underlined emphasis added). Roche argues that "the ENs reflect the fact that provitamins A (including beta-carotene) are inherently dual use (provitamin activity and coloring) products and the drafters of the tariff determined that beta-carotene is to be classified in heading 3204 regardless of whether it is being used for its provitamin A properties or for its coloring properties." Roche's Reply at 3. However, that both EN exclusions expressly employ the word "use" refutes the position that beta-carotene products must be classified under Heading 3204 without concern for their usage. EN 29.36; EN 32.04(I). The ENs are therefore not "special language or context" rendering ARI 1(a) inapplicable to the classification of BetaTab 20%. ARI 1, HTSUS (2002).

Roche finally argues that the principal use framework does not apply because merchandise classified under subheading 3204.19.35 is eligible for duty-free entry under the PA. The K designation was added to subheading 3204.19.35 subsequent to the entries at issue in *E.M. Chems. See E.M. Chems.*, 923 F.Supp. 202, 20 CIT at 385 n. 3; *compare* subheading 3204.19.35, HTSUS (1994) *with* subheading 3204.19.35, HTSUS (1995). According to Roche:

the "K" indicator in the special duty column is a clear indication of Congressional intent that beta-carotene products classified in subheading 3204.19.35 are eligible for duty free entry under [the PA]. If beta-carotene mixtures principally used as provitamins are not classifiable in subheading 3204.19.35, then the [PA] would not apply to any commercial beta-carotene products.

Roche's Supp. Brief at 3.

The K designation is insufficient for this court to disregard its previous holding that "the term 'coloring matter' in Heading 3204 is a principal use provision." *E.M. Chems.*, 923 F.Supp. 202, 20 CIT at 387. That determination was based on Heading 3204's language, Federal Circuit precedent, and EN 32.04. *See id.* at 386–87, 923 F.Supp. 202. Moreover, merchandise that belongs to a class or kind principally used as coloring matter could conceivably be eligible for duty-free entry under the PA, as Lucarotin® 1% in *BASF* was sold, used, and marketed as a colorant.[7] *See BASF I,*

---

**6.** The list of examples that accompanies this EN exclusion does not include beta-carotene, but envisions additional substances by stating "*e.g.*" before the examples. EN 32.04(I). This EN does expressly include "carotenoids obtained by synthesis (e.g., β-carotene)." EN 32.04(I)(E)(15). Roche relies on this inclusion. *See* Roche's Motion at 13; Roche's Reply at 3. However, such a general reference only illustrates that beta-carotene substances may be encompassed in HTSUS Heading 3204, as recognized by this court and the Federal Circuit. *See BASF I,* 29 CIT 681, 688; *BASF II,* 482 F.3d 1324, 1328. The EN

reference to beta-carotene does not suggest all substances containing beta-carotene are to be classified under Heading 3204, particularly given the EN exclusion for substances not used as colorants. *See* EN 32.04(I).

**7.** As Defendant notes, although "the two *BASF* decisions did not discuss 'principal use,' as prescribed by ARI 1(a), that may very well be due to the fact that there was no dispute that the Lucarotin in that case was principally used, if not solely used[,] as a colorant, and belonged to a class that was

29 CIT at 684, 687. In denying duty-free entry, the Federal Circuit noted that Lucarotin® 1% was "not imported as a vitamin product." *BASF II*, 482 F.3d at 1327 n. 3. Vitamins belonging to a class or kind of goods principally used as coloring matter could accordingly be classified under Heading 3204 and eligible for duty-free entry. *See infra*, Part IV.A.4. The K designation is therefore not "special language or context" rendering ARI 1(a) inapplicable to the classification of BetaTab 20%. ARI 1, HTSUS (2002).

**3.**

**Genuine Issues Of Material Fact Affect Whether BetaTab 20% Belongs To A Class Or Kind Of Goods Principally Used As "Coloring Matter"**

**[14]** The principal use inquiry requires a determination of the "class or kind of goods to which" BetaTab 20% belongs. ARI 1(a), HTSUS (2002). Roche emphasizes "that beta-carotene, as a class of merchandise, is principally used as a colorant." Roche's Supp. Brief at 2 (citing *BASF I*, 29 CIT at 685). Defendant counters that BetaTab 20% "fits within a class or kind of goods principally used as ingredients in dietary supplements." Defendant's Supp. Brief at 5. In determining whether BetaTab 20% is "commercially fungible" with either beta-carotene coloring matter or ingredients for dietary supplements, this court will consider multiple factors. *Primal Lite*, 182 F.3d at 1365; *see E.M. Chems.*, 923 F.Supp. 202, 20 CIT at 388 (citing *Carborundum*, 63 C.C.P.A. at 102, 536 F.2d 373).

The "general physical characteristics" factor appears to support Roche based on the undisputed fact that BetaTab 20% "can be used as a colorant." *E.M. Chems.*, 923

F.Supp. 202, 20 CIT at 388 (citing *Carborundum*, 63 C.C.P.A. at 102, 536 F.2d 373); Roche's Facts ¶ 33; Defendant's Factual Response ¶ 33. Defendant's expert testified that BetaTab 20% "could be accurately described as beta-carotene coloring matter" and Defendant concedes that BetaTab 20% is "similar to some products used [as] colorants." Roche's Reply Ex. A: Deposition of Mitchell Russell, M.D., at 63:12–14; Defendant's Supp. Brief at 4. However, BetaTab 20%'s beadlet form may distinguish this merchandise from a class or kind of goods principally used as coloring matter. *See* Tritsch Decl. Ex. 4 at 3 (listing multiple Roche beta-carotene products and identifying the "Main Application" of the only "beadlet" product "[a]s a non-coloring nutrient for dry food preparations.").

Other factors appear to support Defendant, particularly "the manner in which the merchandise is advertised" and "the usage of the merchandise" given the lack of dispute over the "marketing materials" and "actual use of BetaTab 20%." *E.M. Chems.*, 923 F.Supp. 202, 20 CIT at 388 (citing *Carborundum*, 63 C.C.P.A. at 102, 536 F.2d 373); Defendant's Facts ¶ 8; Roche's Factual Response ¶ 8; *see* Defendant's Supp. Brief at 4–5. Despite these indicators from the record, the parties have not satisfactorily applied the principal use factors to the classification of BetaTab 20%.[8] Roche only requests that if ARI 1(a) is found applicable, the court "afford[ ] plaintiff 60 days to either abandon or supplement its motion for summary judgment for classification in K3204.19.35 with additional facts and arguments relevant to the *Carborundum* factors." Roche's Supp. Brief at 5; *see* Roche's Motion; Roche's Reply; Roche's Supp. Brief. Defendant

principally used as colorants." Defendant's Supp. Brief at 2 n. 3.

**8.** The parties only addressed the *E.M. Chems.* principal use issue in response to questions at

oral argument and a court order for supplemental briefing. *See* July 29, 2010 Oral Argument at 7:50–10:05; 27:48–28:03; August 13, 2010 Order.

addresses the factors in a perfunctory fashion without record support. *See* Defendant's Supp. Brief at 4–5; Defendant's Opposition. At this stage, and as in *E.M. Chems.*, that material facts remain in dispute concerning the principal use analysis precludes summary judgment for classification under HTSUS Heading 3204. *See E.M. Chems.*, 923 F.Supp. 202, 20 CIT at 384.

Roche's Motion cannot be granted because of outstanding genuine issues of material fact as to whether BetaTab 20% belongs to the class or kind of goods principally used as coloring matter. *See* ARI 1(a), HTSUS (2002). Either party may move to re-open discovery for the limited purpose of classifying BetaTab 20% under Heading 3204 pursuant to ARI 1(a). After this new discovery period, Roche may move for summary judgment to classify BetaTab 20% under Heading 3204 and Defendant may move for partial summary judgment to establish that BetaTab 20% is not classified under Heading 3204. If an appropriate motion is not filed within 15 days of the date of this Opinion, a trial will be scheduled in this action.

### 4.

### The Remaining Heading 3204 Arguments Need Not Be Resolved At This Stage

Roche's claim for duty-free entry under the PA and Defendant's requested alternate classification under HTSUS subheading 3204.19.50 both depend on BetaTab 20% first being classified under Heading 3204. *See* Defendant's Opposition at 9; Plaintiff's Motion at 18. Unless and until BetaTab 20% is classified under Heading 3204, these issues need not be resolved. Roche's PA arguments will nevertheless be briefly addressed to provide guidance in the event that BetaTab 20% is classified under subheading 3204.19.35. This court in *BASF I* concluded that "Lucarotin® 1% is not 'used in the prevention, diagnosis, alleviation, treatment, or cure of disease in humans or animals,' which the [U.S. International Trade Commission ('ITC')] identifies as a pharmaceutical or 'drug.' Lucarotin® 1% is thus not eligible for duty-free treatment under the [PA]." *BASF I*, 29 CIT at 692 n. 7 (quoting Advice Concerning the Addition of Certain Pharmaceutical Products and Chemical Intermediates to the [PA], ITC Pub. 3167, at 3 (April 1999)).

A preliminary issue is whether BetaTab 20% satisfies this *BASF I* standard. The "proven benefit of beta-carotene in terms of human health ... as a source of vitamin A" supports the conclusion that BetaTab 20% is "used in the prevention, diagnosis, alleviation, treatment, or cure of diseases in humans." Defendant's Facts ¶ 5; Roche's Factual Response ¶ 5; *BASF I*, 29 CIT at 692. The record does not support Defendant's assertion that BetaTab 20% is simply a nutritional supplement devoid of use for therapeutic or prophylactic purposes. *See* Defendant's Opposition at 21; July 29, 2010 Oral Argument at 16:30–19:16. The vitamin A benefit favors Beta-Tab 20% being eligible for duty-free entry in the event that it is classified under subheading 3204.19.35, even if the beneficial health impacts of antioxidants are "a matter of scientific debate." Roche's Factual Response ¶ 5.

More fundamentally, Roche challenges the applicability of the *BASF I* standard to the classification of vitamins. In arguing that beta-carotene vitamins are entitled to duty-free entry under the PA regardless of use as a drug, Roche asks this court to revisit its *BASF I* conclusion. *See* Roche's Motion at 22–23; Roche's Reply at 5–6. The Federal Circuit, in affirming this court's denial of duty-free eligibility under the PA, "note[d] the concern of the *amici curiae* [Roche *et al.*] that if this formulation is denied access to the [PA], other beta-carotene products may be wrongly classified. That concern is unfounded, for Lu-

carotin® 1% is unambiguously not imported as a vitamin product." *BASF II*, 482 F.3d at 1327 n. 3. Roche relies upon this footnote to support the proposition that the Federal Circuit "strongly intimated that a beta-carotene product that was imported as a vitamin product could qualify as a listed product." Roche's Motion at 23.[9]

*BASF II* suggests that the PA may apply to some products that do not satisfy ITC's definition of "pharmaceutical or 'drug.' " *BASF I*, 29 CIT at 692 n. 7 (citation omitted). The Federal Circuit, in affirming that Lucarotin® 1% is not eligible for duty-free entry, indicated that its holding may not apply to vitamins. *See BASF II*, 482 F.3d at 1326, 1327 n. 3. In addition to the footnote addressing Roche, the Federal Circuit emphasized that the "product is not intended for vitamin or other pharmaceutical use." *Id.* at 1326. Therefore, in the event that BetaTab 20% is classified under subheading 3204.19.35, the standard for PA eligibility may differ from the question of whether ITC would recognize the product "as a pharmaceutical or 'drug.' " *BASF I*, 29 CIT at 692 (citation omitted).

### B.

### Summary Judgment Is Not Appropriate To Classify BetaTab 20% Under Heading 2936

Roche in the alternative moves for summary judgment to classify BetaTab 20% as "[p]rovitamins and vitamins, natural or re-

produced by synthesis . . . whether or not in any solvent." Heading 2936, HTSUS (2002); *see* Roche's Motion at 23–30. HTSUS Chapter 29 Note 1 establishes that Chapter 29 covers basic chemicals accompanied only by limited additions. *See* Ch. 29 n. 1, HTSUS (2002). Note 1(f) specifies as permissible the addition of a "stabilizer (including an anticaking agent) necessary for . . . preservation or transport." *Id.* at n. 1(f). A "stabilizer" is defined as "[a]ny substance that tends to maintain the physical and chemical properties of a material." McGraw–Hill Dictionary of Scientific and Technical Terms 2011 (6th Ed.2002).

General EN 29.36(d) provides guidance on the acceptable stabilizers as follows:

> The products of . . . heading [2936] may be stabilised for the purposes of preservation or transport:
>
> -by adding anti-oxidants,
>
> -by adding anti-caking agents . . . ,
>
> -by coating with appropriate substance (e.g., gelatin . . .), whether or not plasticized, . . .
>
> **provided** that the quantity added . . . in no case exceeds that necessary for their preservation or transport and that the addition . . . *does not* alter the character of the basic product and *render it particularly suitable for specific use rather than for general use.*

Gen. EN 29.36(d) (bolded emphasis in original and underlined emphasis added).[10]

---

9. Roche further relies upon Customs determinations for support that all beta-carotene vitamins receive duty-free treatment under the PA when classified under an eligible subheading. *See* Roche's Reply at 5–6 (citing Customs Ruling No. N.Y. B84625 (April 29, 1997) ("NY B84625") (granting PA duty-free treatment for beta-carotene crystalline, "a widely used carotenoid in the food industry"); Customs Headquarters Determination No. 963030 (October 23, 2000) ("HQ 963030") (finding that "[a] product need not be considered a 'drug'

in order to be included in the [PA].")). Because these determinations pre-date *BASF I* and contain only scant analysis, they lack "power to persuade" with respect to the viability of the *BASF I* standard after *BASF II*. *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161; *see* N.Y. B84625; HQ 963030.

10. Defendant relies upon the General EN to Chapter 28 that contains the identical "**provi[sion]**" and is incorporated by reference as "apply[ing] *mutatis mutandis* " by a General EN to Chapter 29. Defendant's Opposition at

Roche contends that the BetaTab 20% qualifies under HTSUS 29 Chapter Note 1(f) because the ingredients beyond beta-carotene are mere stabilizers. *See* Roche's Motion at 25–27. It is undisputed that BetaTab 20% is produced by mixing synthetic beta-carotene crystals with stabilizing ingredients. *See* Roche's Facts ¶ 15; Defendant's Factual Response ¶ 15. "[T]he corn starch acts as an anti-caking agent to maintain particle separation during the manufacture of the beadlet." Tritsch Decl. ¶ 32. Beta-carotene is susceptible to oxidation, which "destroys its provitamin A activity and coloration properties." *Id.* ¶ 7. Defendant agrees that the antioxidants serve a stabilizing function, the gelatin and sucrose protect beta-carotene molecules against oxidation and water vapor, and the sucrose additionally provides for mechanical stability. *See* Roche's Facts ¶¶ 25, 28; Defendant's Factual Response ¶¶ 25, 28.

Defendant argues, however, that these BetaTab 20% ingredients accomplish significantly more than stabilization. *See* Defendant's Opposition at 25–26. Defendant's expert opines:

> The sucrose and gelatin are not simply components of a stabilizing matrix.... [T]he sucrose was added to the preparations for use in making tablets precisely because the sucrose acts as a plasticizer and provides mechanical strength during the tableting process. The gelatin acts as an important emulsifier that assists in providing efficient dispersion of the beta-carotene for greater bioavailability to the body. Thus, the matrix is not

simply a stabilizing agent. The components act as adjuvants—they are added to the beta-carotene to either effectuate the manufacture of the beadlets, to effectuate the use of the beta-carotene in the production of multi-vitamin and other nutritional supplements, to increase the shelf life of the beta-carotene, and/or to increase or aid the beta-carotene's availability in the body.

Declaration of Robert Mitchell Russell, M.D., appended to Defendant's Opposition ("Russell Decl.") at 12–13.

**[15]** Defendant has created a genuine issue whether the BetaTab 20% ingredients "render it particularly suitable for specific use," Gen. EN 29.36(d), namely "in making tablet or capsule forms of dietary or nutritional supplements," Russell Decl. at 11. This "specific use" contrasts with the "general use" of BetaTab 20% providing beta-carotene/provitamin A content and antioxidant activity. Gen. EN 29.36(d). Defendant's expert is highly qualified and has extensive experience researching carotenoids. *See id.* at 1–4. His opinion, based in part upon Roche's patent and marketing materials, *see id.* at 9, 11–13, concludes that "[t]he ingredients/formulation of the [BetaTab 20%] are very suitable for use in preparing the product for use in making tablet or capsule forms of dietary or nutritional supplements," *id.* at 11. Specifically, the sucrose "lends itself uniquely to permit the beta carotene preparation to be used in making tablets and/or for extrusion into capsules." *Id.* This expert testimony supports Beta-Tab 20%'s exclusion from Heading 2936

---

24 (citing Ch. 28 Gen. EN (A); Ch. 29 Gen EN (A)) (emphasis in original). Roche replies that the Chapter 29 EN allowance for plasticized gelatin "takes precedence" over the General EN to Chapter 28 and thereby requires a "necessary change" pursuant to the "*mutatis mutandis*" qualifier. Roche's Reply at 8. However, the identical "**provi[sion]**" is included in the EN for Chapter 29, Gen. EN

29.36(d) (emphasis in original), as recognized by Roche, *see* Roche's Motion at 24–25. This issue arises from Defendant quoting an earlier version of the ENs than does Roche. *See* July 29, 2010 Oral Argument at 39:23–40:52. The 2002 version used by Roche is "perfectly proper" because the subject entries were imported that year. *Id.* at 40:50–52.

because the stabilizing ingredients make it suited for a specific purpose "rather than for general use." Gen. EN 29.36(d).

Roche during discovery conceded that certain "qualities render BetaTab 20% well suited for use in direct compression of tablets." Plaintiff's Response to Defendant's First Interrogatories and Request for Production Directed to Plaintiff, Response No. 71, at 29, attached to Defendant's Letter (July 29, 2010). According to Roche, as compared with another of its beta-carotene products, "BetaTab 20% has a higher concentration of beta carotene, is not dispersible in water below 20° C, and its particles have less extrusion loss in direct compression than other beta carotene particles or powders." *Id.* at 28. Roche's explanation of these qualities creates a genuine issue as to whether the ingredients of BetaTab 20% "render it particularly suitable for specific use rather than for general use." Gen. EN 29.36(d).

Roche does not sufficiently resolve, for summary judgment purposes, this genuine issue concerning the function of the Beta-Tab 20% ingredients.[11] Roche's emphasis on the EN allowing for plasticized gelatin, *see* Plaintiff's Memorandum of Law in Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("Roche's Reply") at 8, does not compel classification of BetaTab 20% under HTSUS Heading 2936 because Defendant's expert testified that the matrix which includes gelatin facilitates tableting and provides more than "stabilis[ation] for the purposes of preservation or transport," Gen. EN 29.36(d); *see* Russell Decl. at 12–13.[12]

Roche's efforts to counter Defendant's arguments demonstrate that summary judgment to classify BetaTab 20% under HTSUS Heading 2936 is inappropriate. Roche argues that the aid of absorption into the body is necessary "for beta-carotene to function as provitamin A," as opposed to a stabilizing ingredient characteristic that warrants exclusion from Heading 2936. Roche's Reply at 10. There is a genuine issue whether BetaTab 20% promotes absorption in common with all provitamin A products or in an enhanced manner to permit use as a tablet-form sup-

11. Roche does establish that the stabilizing ingredients in BetaTab 20% are not in quantities greater than necessary to achieve stabilization and do not alter the molecule of beta-carotene. *See* Roche's Motion at 26–27 (citing Declaration of Joseph M. Spraragen ("Spraragen Decl.") Ex. 5: Deposition of Mitchell Russell, M.D., at 69:6–23, 64:12–65:3). Roche argues that "BetaTab 20% is suitable for general use as provitamin A." *Id.* at 27. However, Roche does not establish the absence of a genuine issue whether the stabilizing ingredients "render it particularly suitable for specific use rather than for general use." Gen. EN 29.36(d); *see* Roche's Motion at 23–30; Roche's Reply at 7–10.

12. Roche relies on Customs having classified vitamins containing stabilizing gelatin under HTSUS Heading 2936. *See* Roche's Motion at 29 (citing Customs Headquarters Determination No. 953829) (July 26, 1993) ("HQ 953829"); Customs Headquarters Determination No. 955754 (August 22, 1994) ("HQ

955754"); Customs Headquarters Determination No. 955867 (August 22, 1994) ("HQ 955867"). These decisions do not warrant deference supporting Roche because each includes only scant analysis devoid of explanation as to why the stabilizing gelatin did not render those vitamins more suitable for their intended use as "animal feed." HQ 953829; HQ 955754; HQ 955867; *see Skidmore,* 323 U.S. at 140, 65 S.Ct. 161. Similarly, a Harmonized System Committee of the World Customs Organization decision relied upon by Roche does not address whether the stabilizers in Rovimix, an animal feed product containing beta-carotene, rendered the product more suitable for use as animal feed. *See* Roche's Motion at 28–29; Spraragen Decl. Ex. 2: Customs Co-operation Council, Classification of "Rovimix $AD_3$" (December 6, 1990). Roche also relies upon a Canadian International Trade Tribunal decision which it acknowledges is "not entitled to deference." Roche's Motion at 29–30.

plement. *See* Defendant's Opposition at 26. Although Roche and Defendant agree that BetaTab 20% must be "combined with tableting excipients . . . to be formed into a tablet," Roche's Facts ¶ 35; *see* Defendant's Factual Response ¶ 35, there is a genuine issue whether the stabilizing ingredients further render BetaTab 20% "particularly suitable for specific use rather than for general use." Gen. EN 29.36(d).

With respect to sucrose, Roche disputes Defendant's argument that this ingredient " 'uniquely' permits BetaTab 20% to be used in making tablets and capsules." Roche's Reply at 8 (quoting Defendant's Opposition at 25). Defendant's expert based this conclusion on Roche's patent. *See* Russell Decl. at 12. Roche counters with supplemental expert opinion, based on Roche's patent, that "[t]he benefits of mechanical stability are not limited to dry

products forms used in making tablets and capsules." Supplemental Declaration of John Claude Tritsch ¶ 5. This expert dispute evidences a genuine issue whether the sucrose renders BetaTab 20% "particularly suitable for specific use rather than for general use." Gen. EN 29.36(d). That sucrose and other BetaTab 20% ingredients are stabilizers does not compel classification under Heading 2936 given the genuine issue as to their additional functionality.

## V

## CONCLUSION

For the above stated reasons, Plaintiff Roche Vitamin, Inc.'s Motion for Summary Judgment is DENIED.



**ORDERED** that defendant-intervenor U.S. Magnesium LLC is awarded a combined $34,042.72 in fees and costs; and

**ORDERED** that plaintiff Tianjin Magnesium International Co., Ltd. and plaintiff's counsel, the law firm of Riggle and Craven, shall be jointly and severally liable to pay both awards in full within sixty (60) days of the filing of this order.



**ROCHE VITAMINS, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Slip Op. 13–73.

Court No. 04–00175.

United States Court of International Trade.

June 14, 2013.

**Background:** Importer filed suit challenging Customs and Border Protection's (Customs) tariff classification, under Harmonized Tariff Schedule of the United States (HTSUS), of importer's beta-carotene product.

**Holding:** The Court of International Trade, Eaton, J., held that product was classifiable as provitamins unmixed.

Judgment for plaintiff.

**1. Customs Duties ⟜17**

When reviewing tariff classification decisions by Customs and Border Protection, Court of International Trade applies the Harmonized Tariff Schedule of the United States (HTSUS) General Rules of Interpretation (GRIs) and the HTSUS Additional United States Rules of Interpretation (ARIs) in numerical order. Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**2. Customs Duties ⟜17**

In determining a tariff classification under the Harmonized Tariff Schedule of the United States (HTSUS), Court of International Trade first construes the language of the heading, and any section or chapter notes in question, to determine whether the product at issue is classifiable under the heading. Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**3. Customs Duties ⟜17**

Tariff headings under the Harmonized Tariff Schedule of the United States (HTSUS) are construed without reference to their subheadings, which cannot either limit or broaden the scope of a heading. Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**4. Customs Duties ⟜17**

Absent contrary legislative intent, Harmonized Tariff Schedule of the United States (HTSUS) terms are to be construed according to their common and commercial meanings, which are presumed to be the same. Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**5. Customs Duties ⟜84(6)**

Court of International Trade is required to decide the correctness not only of the importer's proposed tariff classification under the Harmonized Tariff Schedule of the United States (HTSUS), but of the government's classification as well. Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**6. Customs Duties ⟜84(7)**

The presumption of correctness of Customs and Border Protection's factual determinations, in determining a tariff classification under the Harmonized Tariff Schedule of the United States (HTSUS), is a procedural device that allocates the burden of producing evidence, placing the burden on the importer to show that there

was insufficient evidence for the factual components of Customs' decision. 28 U.S.C.A. § 2639(a)(1); Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**7. Customs Duties ⟲30(5)**

The Harmonized Tariff Schedule of the United States (HTSUS) heading, governing food preparations not elsewhere specified or included, is an expansive basket heading that only applies in the absence of another applicable heading. Harmonized Tariff Schedule, HTSUS 2106.00.00.

**8. Customs Duties ⟲30(5)**

To prima facie fall under the Harmonized Tariff Schedule of the United States (HTSUS) basket heading governing food preparations not elsewhere specified or included, two criteria must be met: the product must be (1) a food preparation, which is (2) not elsewhere specified or included. Harmonized Tariff Schedule, HTSUS 2106.00.00.

**9. Customs Duties ⟲19**

Principal use provisions under the Harmonized Tariff Schedule of the United States (HTSUS) call for a factual determination as to the group of goods that are commercially fungible with the imported goods so as to identify the use which exceeds any other single use. Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**10. Customs Duties ⟲19**

In determining a tariff classification under the principal use provisions of the Harmonized Tariff Schedule of the United States (HTSUS), Court of International Trade customarily uses several factors, commonly referred to as the *Carborundum* factors, to inform its determination as to which goods are commercially fungible with the imported goods, including use in the same manner as merchandise which defines the class, general physical characteristics of the merchandise, economic practicality of so using the import, expec-

tation of ultimate purchasers, channels of trade in which the merchandise moves, environment of the sale such as accompanying accessories and manner in which the merchandise is advertised and displayed, and recognition in the trade of this use. Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**11. Customs Duties ⟲19**

In determining a tariff classification under the Harmonized Tariff Schedule of the United States (HTSUS), the actual use of the goods is evidence of the principal use but is still only one of a number of factors. Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**12. Customs Duties ⟲17**

Under the Harmonized Tariff Schedule of the United States (HTSUS), the Explanatory Notes (EN), while not legally binding, are persuasive and are generally indicative of the proper interpretation of a tariff provision. Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**13. Customs Duties ⟲24(2)**

Merchandise that might otherwise be classified under the headings of the Harmonized Tariff Schedule of the United States (HTSUS) chapter pertaining to provitamins becomes particularly suitable for specific use, and is thus excluded from those headings, when (1) the ingredients added to it facilitate uses not ordinary to goods of the heading, or (2) where the added ingredients alter the chemical's reactive properties in a manner that excludes uses ordinary to goods of the heading. Harmonized Tariff Schedule, HTSUS 2106.00.00.

**14. Customs Duties ⟲24(2)**

A product's increased suitability for an ordinary application of its chemical component will not exclude it from the Harmonized Tariff Schedule of the United

States (HTSUS) chapter pertaining to pro-vitamins, so long as the product can still be used as that chemical in other ordinary ways; however, added ingredients that make a chemical highly capable of a use that is not an ordinary use of chemicals of the heading will render the item particularly suitable for specific use rather than for general use and exclude it from classification in the headings of that chapter. Harmonized Tariff Schedule, HTSUS 2106.00.00.

**15. Customs Duties ⬅38(5)**

In determining whether an import listed in the Pharmaceutical Appendix is used as or in a pharmaceutical product, as required to enter duty-free, the principal use of the goods for tariff classification purposes is not determinative.

**16. Customs Duties ⬅19**

A principal use determination for tariff classification purposes, under the Harmonized Tariff Schedule of the United States (HTSUS), calls for the identification of the use which exceeds any other single use, turning not on the actual use of the product, but on the use of the class or kind of goods commercially fungible with the product. Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

**17. Customs Duties ⬅38(5)**

Duty-free status under the Pharmaceutical Appendix turns on whether consumers of the imported product itself intend to use it in a pharmaceutical manner.

**18. Statutes ⬅1156**

A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative, superfluous, void, or insignificant.

**19. Customs Duties ⬅24(4)**

Importer's beta-carotene product was classifiable as provitamins unmixed, under Pharmaceutical Appendix and Harmonized Tariff Schedule of the United States (HTSUS), rather than classifiable under HTSUS as food preparations not elsewhere specified or included, or as synthetic organic coloring matter and/or preparations based thereon; product was principally used as source of provitamin A in foods or vitamin products, not as coloring matter, and product's additional non-beta-carotene ingredients added as stabilizers did not make product particularly suitable for specific use. Harmonized Tariff Schedule, HTSUS 2106.90.97, 2936.10.00, 3204.19.35.

**20. Customs Duties ⬅17**

Under the Harmonized Tariff Schedule of the United States (HTSUS), an eo nomine provision is one in which an item is identified by name. Harmonized Tariff Schedule, HTSUS 0101.10.00 et seq.

───────────

Erik D. Smithweiss, Los Angeles, CA, Robert B. Silverman, and Joseph M. Spraragen, New York, NY, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP, for plaintiff.

Saul Davis, Civil Division, Department of Justice, New York, NY; Stuart F. Delery, Acting Assistant Attorney General, and Barbara S. Williams, Attorney in Charge; International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant.

*OPINION*

EATON, Judge:

Before the court is Roche Vitamins, Inc.'s ("plaintiff" or "Roche") challenge to the classification by United States Customs and Border Protection ("Customs") of Roche's product "BetaTab 20%" ("the merchandise" or "BetaTab"). The court exercises jurisdiction pursuant to 28

U.S.C. § 1581(a) (2000). The case was tried on July 17 through 19, 2012 and post-trial briefing was completed on November 28, 2012. Based on the findings of fact and conclusions of law set forth below, the court enters judgment for plaintiff, pursuant to USCIT R. 52(a) and 58.

### BACKGROUND

Plaintiff challenges Customs' classification of the merchandise, entered on December 16, 2002, under the 2002 Harmonized Tariff Schedule of the United States ("HTSUS") subheading 2106.90.97 as "[f]ood preparations not elsewhere specified or included: [o]ther: [o]ther." Joint Proposed Pretrial Order, Sched. C ¶ 4 (ECF Dkt. No. 93) ("PTO"). Plaintiff, the importer of record, timely filed a protest to the liquidation of the merchandise and, after paying all assessed duties and fees, commenced this action when its protest was denied. PTO ¶¶ 1, 5–6. Plaintiff argues that the "merchandise is properly classifiable as a synthetic organic coloring matter and/or preparations based thereon. [B]eta-carotene, under [HTSUS] subheading [3204.19.35]." Pl.'s Compl. ¶ 13 (ECF Dkt. No. 4). In the alternative, Roche also claims that the merchandise is classifiable under subheading K3204.19.35 of the Pharmaceutical Appendix and under HTSUS subheadings 2936.10.00 and 2936.90.00 as "provitamins." [1] Pl.'s Compl. ¶¶ 16, 19.

On December 23, 2010, this Court denied Roche's motion for summary judgment. *Roche Vitamins, Inc. v. United States,* 34 CIT ——, ——, 750 F.Supp.2d 1367, 1382 (2010) (Wallach, J.) ("*Roche I* "). There, the Court held that genuine issues of fact as to the principal use of the merchandise and the functionality of the merchandise's ingredients other than beta-car-

otene precluded summary judgment. *Id.* at ——, 750 F.Supp.2d at 1378, 1382.

During the course of the trial, the court heard testimony from three witnesses called by the plaintiff and one witness called by the United States. Plaintiff's witnesses were Dr. Jean–Claude Tritsch, Roche's technical director at the time of importation, Dr. Steven Schwartz, an expert on the bioavailability of carotenoids, and Lynda Doyle, a former employee of Roche's marketing department with knowledge of Roche's marketing strategy for the merchandise. The Government's sole witness was Dr. Robert Russell, a physician specializing in gastroenterology. Following trial, the parties submitted proposed findings of fact and conclusions of law.

### LEGAL FRAMEWORK

#### I.  Standard of Review

The court makes its conclusions of law and findings of fact following a trial de novo. *See* 28 U.S.C. § 2640(a)(1) (2006) ("The Court of International Trade shall make its determinations upon the basis of the record made before [it]."); *see also United States v. Mead Corp.,* 533 U.S. 218, 233 n. 16, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) ("The [Court of International Trade] 'may consider any new ground' even if not raised below ... and 'shall make its determinations upon the basis of the record made before the court,' rather than that developed by Customs." (citations omitted)).

[1–5] When reviewing Customs' classification decisions, the court applies the HTSUS General Rules of Interpretation ("GRIs") and the HTSUS Additional U.S. Rules of Interpretation ("ARIs") in numer-

---

**1.** Plaintiff's complaint also challenged the classification of its product B-carotene 7% CWS. Pl.'s Compl. ¶ 11. On November 13, 2009, the parties entered a stipulation that B-

carotene 7% CWS is classifiable under HTSUS 3204.19.35. Stipulation ¶ 3 (ECF Dkt. No. 48). Thus, the classification of that product is no longer in dispute.

ical order.[2] *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364 (Fed. Cir.2011). GRI 1 mandates that tariff classification initially "be determined according to the terms of the headings and any relative section or chapter notes." " '[A] court first construes the language of the heading, and any section or chapter notes in question, to determine whether the product at issue is classifiable under the heading.' . . . [T]ariff headings are construed without reference to their subheadings [which cannot] either limit or broaden the scope of a heading." *Dependable Packaging Solutions, Inc. v. United States*, 37 CIT ——, ——, Slip Op. 13–23, at 7, 2013 WL 646328 (2013) (quoting *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed.Cir.1998)). "Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same." *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed.Cir.1999) (citing *Simod Am. Corp. v. United States*, 872 F.2d 1572, 1576 (Fed.Cir.1989)). The court "is required to decide the correctness not only of the importer's proposed classification but of the government's classification as well." *See Jarvis Clark Co. v. United States*, 733 F.2d 873, 874 (Fed.Cir.1984).

[6] Customs' factual determinations are entitled to a presumption of correctness. *See* 28 U.S.C. § 2639(a)(1). "The presumption is a procedural device that allocates the burden of producing evidence . . ., placing the burden on [the plaintiff] to show that there was insufficient evidence for the factual components of [Customs'] decision." *Chrysler Corp. v. United States*, 592 F.3d 1330, 1337 (Fed.Cir.2010) (citations omitted).

**II. The Competing Headings**

[7, 8] Here, Customs classified the BetaTab under HTSUS heading 2106: "Food preparations not elsewhere specified or included." This provision "is an expansive basket heading that only applies in the absence of another applicable heading." *R.T. Foods, Inc. v. United States*, 36 CIT ——, ——, 887 F.Supp.2d 1351, 1358 (2012). "To *prima facie* fall under [this] heading . . . two criteria must be met: the product[ ] must be (1) a food preparation, which is (2) not elsewhere specified or included." *Id.* Thus, to overcome the presumption of correctness, Roche must demonstrate either that the evidence does not support classification of the merchandise as a "food preparation," or that the evidence supports classification of the merchandise under a different heading. *See Orlando Food*, 140 F.3d at 1441 ("Inherent in the term 'preparation' is the notion that the object involved is destined for a specific use."); *see also Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1316 (Fed. Cir.2012); *Arbor Foods, Inc. v. United States*, 30 CIT 670, 677, 2006 WL 1359965 (2006).

Plaintiff claims the BetaTab is alternatively classifiable as a "coloring matter" under HTSUS heading 3204 (and K3204 by the inclusion of beta-carotene in the Pharmaceutical Appendix) or as a provitamin[3] under HTSUS heading 2936. In

---

2. The GRIs and ARIs are part of the HTSUS statute which "consists of '(A) the General Notes; (B) the General Rules of Interpretation; (C) the Additional U.S. Rules of Interpretation; (D) sections I to XXII, inclusive (encompassing chapters 1 to 99, and including all section and chapter notes, article provisions, and tariff and other treatment accorded thereto); and (E) the Chemical Ap-

pendix'." *Baxter Healthcare Corp. of P.R. v. United States*, 182 F.3d 1333, 1337 (Fed.Cir. 1999) (citing 19 U.S.C. § 3004(a) (1994)).

3. Generally, a provitamin is "[a] substance which is converted into a vitamin within an organism." Oxford English Dictionary 721 (2d ed. 1989); American Heritage Dictionary of the English Language 1412 (4th ed. 2000) ("A

*Roche I,* this Court interpreted heading 3204's term "coloring matter" to be a principal use provision. *Roche I,* 34 CIT at ——, 750 F.Supp.2d at 1375–1377. Because note 2(f) to Chapter 29 (the chapter pertaining to provitamins) excludes "synthetic organic coloring matter" from that chapter, whether classification under heading 2936 is appropriate here also hinges, in part, on whether or not the merchandise is principally used as a "coloring matter." *Id.* at ——, 750 F.Supp.2d at 1375 ("Note 2(f) . . . cross-references the term 'coloring matter.' "). In other words, if the class or kind of goods commercially fungible with the merchandise is principally used as a "coloring matter," the merchandise will be classifiable under heading 3204 and excluded from 2936 by application of Chapter 29 note 2(f).

**[9–11]** Principal use provisions " 'call for a [factual] determination as to the group of goods that are commercially fungible with the imported goods' " so as to identify "the 'use which exceeds any other *single* use.' " *Aromont,* 671 F.3d at 1312 (quoting *Primal Lite, Inc. v. United States,* 182 F.3d 1362, 1365 (Fed.Cir.1999); *Lenox Collections v. United States,* 20 CIT 194, 196, 1996 WL 47155 (1996)). This Court customarily uses several factors, commonly referred to as the "*Carborundum* Factors," to inform its determination as to which goods are "commercially fungible with the imported goods." *Id.* (quoting *Primal Lite,* 182 F.3d at 1365) (internal quotation marks omitted).

These factors include: use in the same manner as merchandise which defines the class; the general physical characteristics of the merchandise; the eco-

nomic practicality of so using the import; the expectation of the ultimate purchasers; the channels of trade in which the merchandise moves; the environment of the sale, such as accompanying accessories and the manner in which the merchandise is advertised and displayed; and the recognition in the trade of this use.

*Id.* at 1313 (citing *United States v. Carborundum Co.,* 63 CCPA 98, 536 F.2d 373, 377 (1976)). The actual use of the goods "is evidence of the principal use" but is still only "one of a number of factors." *Id.*

**[12]** Even if the merchandise is not principally used as a colorant, it is not necessarily classifiable as a provitamin under HTSUS heading 2936. Here, for instance, the BetaTab is not the provitamin beta-carotene in its pure form. Additional stabilizers were added to beta-carotene crystalline during the BetaTab's manufacturing process. Chapter 29 note 1(f) only permits the addition of a stabilizer to provitamins where "necessary for their preservation or transport." *See also* Explanatory Notes to the Harmonized Commodity Description and Coding System, $29.36_2$ (3d ed. 2002) ("Explanatory Notes") ("The products of this heading may be stabilised for the purposes of preservation or transport . . . **provided** that the quantity [of stabilizer] added or the processing in no case exceeds that necessary for their preservation or transport and that the addition or processing does not alter the character of the basic product and render it particularly suitable for specific use rather than for general use.").[4] In other words, if the quantity of a stabilizing agent added to an

vitamin precursor that the body converts to its active form through normal metabolic processes. Carotene, for example, is a provitamin of vitamin A.").

**4.** The Explanatory Notes, "while not legally binding, are 'persuasive' and are 'generally

indicative' of the proper interpretation of [a] tariff provision." *See Lemans Corp. v. United States,* 660 F.3d 1311, 1316 (Fed.Cir.2011) (quoting *Drygel, Inc. v. United States,* 541 F.3d 1129, 1134 (Fed.Cir.2008)).

item of this heading is more than is necessary for transport or preservation,[5] or the nature of the stabilizing agent alters the character of the basic product so as to render it "particularly suitable for specific use," the item may not be classified as a provitamin under HTSUS heading 2936. *See Roche I*, 34 CIT at ——, 750 F.Supp.2d at 1380.

**[13, 14]** Merchandise that might otherwise be classified under the headings of Chapter 29 becomes "particularly suitable for specific use," and is thus excluded from those headings, when (1) the ingredients added to it facilitate uses not ordinary to goods of the heading or (2) where the added ingredients alter the chemical's reactive properties in a manner that excludes uses ordinary to goods of the heading. *See, e.g., Degussa Corp. v. United States*, 508 F.3d 1044, 1046 (Fed.Cir.2007) (finding particularly suitable for a specific use a chemical with modified reactive properties that promoted its incorporation into "certain organic solvents and polymers"). Thus, a product's increased suitability for an *ordinary* application of its chemical component will not exclude it from Chapter 29, so long as the product can still be used as that chemical in other ordinary ways. Added ingredients that make a chemical[6] highly capable of a use that is *not an ordinary use of* chemicals of the heading, however, will render the item "particularly suitable for specific use rather than for general use" and exclude it from classification in the headings of Chapter 29.

## III. The Pharmaceutical Appendix

Certain imports are entitled to duty free status by virtue of their inclusion in the Pharmaceutical Appendix. An import is entitled to such status if, when imported from an eligible country and claimed by the importer, "the individual product [is] listed in the Pharmaceutical Appendix," its tariff classification contains "the symbol 'K' [in the] special rates of duty subcolumn for those 8-digit subheadings which contain active ingredients and chemical intermediaries," and it is "used in the prevention, diagnosis, alleviation, treatment, or cure of disease in humans." *Advice Concerning the Addition of Certain Pharmaceutical Products and Chemical Intermediates to the Pharmaceutical Appendix to the Harmonized Tariff Schedule of the United States*, USITC Pub. 3167, at 7, 3 (Apr. 1999) ("*Advice re: Pharm. App'x*"); *BASF Corp. v. United States*, 29 CIT 681, 693–94 n. 7, 391 F.Supp.2d 1246, 1256 n. 7 (2005) ("*BASF I*") ("[The import must be] 'used in the prevention, diagnosis, alleviation, treatment, or cure of disease in humans or animals,' which the [International Trade Commission] identifies as a pharmaceutical or 'drug.'" (quoting *Advice re: Pharm. App'x* at 3)), *aff'd*, 482 F.3d 1324 (Fed.Cir.2007) ("*BASF II*"); *see also* HTSUS General Note 13 ("Whenever a rate of duty of 'Free' followed by the symbol 'K' in parentheses appears in the 'Special' subcolumn for a heading or subheading, any product (by whatever name known) classifiable in such provision which is the product of a country eligible for tariff treatment under column 1 shall be entered free of duty, *provided* that such product is included in the pharmaceutical appendix to the tariff schedule."). In other words, to enter duty-free, the good must be listed in the Pharmaceutical Appendix, classified in an appropriate sub-

---

5. The court held at summary judgment that "the stabilizing ingredients ... are not in quantities greater than necessary to achieve stabilization and do not alter the molecule of beta-carotene" and the parties did not dispute this point at trial. *Roche I*, 34 CIT at ——, 750 F.Supp.2d at 1381 n. 11.

6. Beta-carotene is an organic chemical. *See* Tr. 124.

heading, and intended ultimately to be used as or in a pharmaceutical product.

**[15–17]** In determining whether the import is used as or in a pharmaceutical product, the "principal use" of the goods for classification purposes is not determinative. As noted, a "principal use" determination for classification purposes calls for the identification of the use "which exceeds any other *single* use," turning not on the actual use of the product, but on the use of the class or kind of goods "commercially fungible" with the product. *Aromont*, 671 F.3d at 1312. Duty-free status under the Pharmaceutical Appendix, however, turns on whether consumers of the product itself intend to use it in a pharmaceutical manner. *See BASF II*, 482 F.3d at 1326 (denying a beta-carotene product duty-free status because it was not "disputed that [the] product is not intended for vitamin or other pharmaceutical use, but is intended for use as a food colorant").

**[18]** The structure of the HTSUS makes this distinction clear. There are numerous headings and subheadings that call for a non-pharmaceutical principal use, but which, nevertheless, also contain the symbol "K" in their special rates of duty subcolumn. *See, e.g.*, HTSUS 3203.00.80; 3204.13.60; 3204.13.80; 3204.90.00. Inclusion of the symbol, therefore, indicates that Congress intended that some imports with a non-pharmaceutical "principal use" are entitled to duty free status under the Pharmaceutical Appendix nonetheless. Were that not the case, the inclusion of the symbol "K" in these subheadings would be a dead letter in every such instance. Moreover, such an interpretation would run afoul of "one of the most basic interpretive canons, that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative, superfluous, void or insignificant.'" *Corley v. United States*, 556 U.S. 303, 314,

129 S.Ct. 1558, 173 L.Ed.2d 443 (2009) (citation omitted).

### FINDINGS OF FACT

As an initial matter, the court finds that, having had the opportunity to observe their demeanor during direct and cross-examination, all four witnesses testified credibly at trial.

### I. Principal Use of the Merchandise

The stipulated facts and evidence adduced at trial, when analyzed under the rubric of the *Carborundum* factors, establish that the principal use of the merchandise is as a source of provitamin A in foods or vitamin products, rather than as a coloring matter.

First, the merchandise is actually used in the same manner as other vitamin and provitamin formulations intended for use in the domestic manufacture of vitamin supplements and fortified foods. Beta-carotene products are used to provide provitamin A activity in the manufacture of direct compression tablets, gel capsules, and nutrient powders. Put another way, these products are used, regardless of coloring ability, in the manufacture of the types of goods sold as vitamin supplements at drugstores and retailers like GNC or Vitamin Shoppe. Tr. 623–24. The products are also used in fortified food products, such as food bars and cereals, for coloration and provitamin activity, or for provitamin activity alone. Tr. 606–09, 612–13. BetaTab was developed for use in vitamin products and its actual use during the relevant time period was predominantly as a source of provitamin A for vitamin products. PTO ¶ 31; Tr. 615. The "vast majority of" the merchandise has been used for vitamin products. PTO ¶ 30.

Next, the general physical characteristics of the merchandise lend themselves to a principal use as a vitamin supplement.

**Add. 24**

The merchandise "is a mixture containing beta-carotene, antioxidants, gelatin, sucrose and corn starch." PTO ¶ 20. Beta-carotene crystalline, which makes up twenty percent of the mixture, is an organic colorant with provitamin A activity. PTO ¶ 8, 10, 22. The merchandise can be used as a source of vitamin A in foods, beverages, and vitamin products, or as a colorant. PTO ¶ 23, 29. Further, it is a water miscible version of provitamin A. Tr. 726. The merchandise, however, has a higher concentration of beta-carotene than other products used primarily for coloring and, unlike some of those products, is only dispersible in water above twenty degrees Celsius. PTO ¶ 27, 37. The high concentration and high bioavailability of beta-carotene in the merchandise makes it preferable for use in dietary supplement tablets. Tr. 704–07. In most cases, a higher potency beta-carotene product is preferred for the manufacture of tablets in the dietary supplement industry. Tr. 155–56. Moreover, the merchandise was developed by Roche specifically "for use in high potency and anti-oxidative vitamin tablets." Tr. 291.

Use of the BetaTab as an ingredient to provide provitamin A activity, rather than as a colorant, is commercially practical. The majority of the merchandise sold by Roche in 2002 was sold for nutritional use. Tr. 615; Pl.'s Ex. 42. Other beta-carotene products that do not provide coloration, such as Roche's B–Carotene 10% B, are sold for nutritional use to large food producers. Tr. 612–13; Pl.'s Ex. 42. BASF, a significant competitor of Roche, also sold beta-carotene products primarily for use in the manufacture of tablets and capsules. Tr. 616–19. The BetaTab is marketed for use as a vitamin A source in vitamin products and "the vast majority of" the merchandise has been used for vitamin products. PTO ¶ 28, 30. The merchandise can, however, also be used in an economically practical manner as a colorant. Tr.

573–576. As such, this factor is not very probative.

The ultimate purchasers of the BetaTab do not draw a bright-line distinction between its use as colorant and its use as a vitamin. Roche's customers understand that beta-carotene products have a dual function as both a colorant and a source of provitamin A activity. Tr. 577. Accordingly, purchasers expect the merchandise to provide both nutrition and coloration simultaneously. Tr. 577. Thus, this factor is also not particularly probative.

The channels of trade in which the merchandise moves and the recognition of the use in the trade indicate a principal use as a provitamin product. The beta-carotene used in the manufacture of the merchandise is produced domestically by Roche, sent abroad for processing, and then imported as a mixture with the additional components. PTO ¶ 40. Manufacturers of vitamin tablets are considered to be part of the dietary supplement industry and not part of the food industry. Tr. 621–22. There is a recognized market for direct compression tablets and capsules. See Tr. 640. The merchandise was targeted for sale in that market by the Roche sales employees and "recommended strictly for nutrition." Tr. 640–41. Roche's research and development reports list only other beta-carotene products that are not used as colorants as products competitive with the merchandise. Tr. 302–03; Def.'s Ex. H6 at 6. Roche's annual sales report for 2002 identifies the merchandise, and no other merchandise, as sold through Roche's "Human Nutrition Health" division. Tr. 252; Def.'s Ex. G.

The environment of sale and advertising strongly indicate that the BetaTab is principally used as a source of provitamin A. The merchandise "was not produced or marketed for sale as a colorant during the relevant time period" and Roche's market-

ing materials make no mention of the merchandise's "use as a food colorant." PTO ¶ 31, 34. Those materials also lack any indication of the color intensity the merchandise would be expected to produce if used as a colorant. PTO ¶ 34. The merchandise is marketed as "tablet grade" so as to direct sales of the product by Roche employees to the "dietary supplement industry." Tr. 535. The term "tablet grade" indicates that the merchandise can be used in the manufacture of direct compression tablets. Tr. 262–63, 535. Even though Roche's sales employees would work directly with customers in order to determine which of Roche's various beta-carotene products would best suit their needs, and those employees did not necessarily rely on color charts and stability testing to recommend products, Roche personnel tended to sell the merchandise to customers that intended to use it in direct compression tablets and capsules. Tr. 539, 597–98.

## II. The Merchandise is Not Particularly Suited for a Specific Use

The additional ingredients added to the mixture do not make the BetaTab particularly suited for specific use outside of the ordinary uses of beta-carotene. First, a stabilizing matrix of some kind is necessary for any beta-carotene product. In its pure crystalline form, beta-carotene is unstable and susceptible to oxidation, which destroys its healthful properties and usefulness as a colorant. PTO ¶ 11, 14–15. Beta-carotene must be processed and combined with other ingredients to be commercially usable as either a provitamin or a colorant. PTO ¶ 11.

Roche's manufacturing process does not change the BetaTab's functionality as a provitamin. The manufacturing process Roche uses to create the merchandise does not change the character of the beta-carotene as provitamin A. Tr. 726. The process used to create the BetaTab, that is,

the technology by which Roche adds additional ingredients that envelop the beta-carotene crystalline in a matrix, is common throughout the industry for several different types of vitamin. Tr. 42. That same technology is used to produce all Roche beta-carotene forms. Tr. 43. There is no evidence that the merchandise's non-beta-carotene ingredients enhance absorption or bioavailability of the beta-carotene in a manner greater than any other stabilizing matrix. Tr. 331–35, 357, 379, 389, 393, 472–73, 715–17. Moreover, an increase in the bioavailability of a provitamin product does not change its use as a provitamin. Provitamins for human consumption are intended to be ingested and processed by the body to yield vitamin activity. The increased bioavailability of a particular provitamin merely improves that ordinary use of goods within the class of provitamins.

That the additional ingredients make the BetaTab highly suitable for tableting does not make the merchandise particularly suitable for a specific use. Although highly suitable for tableting, the merchandise contains no ingredients specifically prepared for tableting. Tr. 164–66. That suitability is not at odds with use as a provitamin or with the product's other uses. The additional ingredients, or matrices, of the various Roche products are "basically the same" for lower potency products suitable for human consumption that are used for coloration purposes as for higher potency products that are used for vitamin and nutritional products. Tr. 350, 349–57. Other Roche products, primarily used as colorants, also have characteristics that make them highly suitable for tableting. Tr. 403. Some of those products are used to make tablets for nutritional use. Tr. 425–28. The merchandise is well suited for fortifying foods with provitamin A. Tr. 446–47. Other, less potent, Roche beta-carotene products are

also well suited for fortifying foods. Tr. 448–449.

Finally, the tableting process is a step that transforms the merchandise, which is essentially a bulk beta-carotene ingredient, into a final product for sale. The merchandise's increased suitability to be used in the creation of tablets for retail sale is a particular kind of use within the uses common to members of the provitamin category.

## III. The Merchandise is Used as an Ingredient in Products Designed to Promote Health

The merchandise is primarily used to create vitamin supplements and fortified foods. As noted, "the vast majority of" the merchandise has been used for vitamin products and the merchandise is principally used in that manner. PTO ¶ 30. The product was sold through Roche's "Human Nutrition Health" division. Tr. 252; Def.'s Ex. G. Dietary supplements are intended to provide customers with nutrients that they are not otherwise ingesting in sufficient amounts for optimal health. Tr. 374–75. Like most supplements, the merchandise is a "formulation that is meant to maintain general health or well-being." Tr. 478. Although the product would not normally be used in the medical treatment of vitamin A deficiency, it is used with the purpose of maintaining healthy levels of vitamin A. Tr. 730. In addition to helping those who consume it to avoid vitamin A deficiency, research suggests that provitamin A may have a prophylactic effect against certain cancers. Tr. 731–32. Thus, the BetaTab is used in a manner designed to promote human health.

## CONCLUSIONS OF LAW

### I. The Merchandise is Properly Classified under HTSUS Heading 2936

[19] As determined at trial, the merchandise is principally used a source of provitamin A in foods or vitamin products, rather than as a "coloring matter." Consequently, the BetaTab cannot be classified under Heading 3204. As noted, in order to be classified under HTSUS heading 3204, an imported good must be principally used as a "coloring matter." *Roche I*, 34 CIT at ——, 750 F.Supp.2d at 1375–78. Thus, the merchandise cannot be classified under Heading 3204. Because the merchandise cannot be classified under subheading 3204.19.35, the court does not reach whether the BetaTab would qualify for duty-free entry under that subheading as a result of its inclusion in the Pharmaceutical Appendix.

The merchandise is a "provitamin" covered by Heading 2936.[7] There is no dispute that beta-carotene is provitamin A. It was demonstrated as a matter of fact at trial that the BetaTab's additional non-beta-carotene ingredients, added as stabilizers, do not make the merchandise particularly suitable for specific use.[8] Con-

---

**7.** Heading 2936 covers: "Provitamins and vitamins, natural or reproduced by synthesis (including natural concentrates), derivatives thereof used primarily as vitamins, and intermixtures of the foregoing, whether or not in any solvent."

**8.** Although it did not have the burden of proof, the defendant attempted to demonstrate at trial that the stabilizing ingredients made the pelletized crystals more suitable for absorption by the human intestines than would otherwise be the case. The defendant's

purpose was to demonstrate that the stabilizers made the BetaTab particularly suitable for a particular use. The defendant, however, did not succeed. There was no evidence produced at trial that the stabilizing ingredients made the merchandise more absorbable by the intestines than provitamin A would be if stabilized by other ingredients. Hence, even if increased bioavailability were sufficient to exclude classification under Chapter 29, the facts necessary for that proposition were not established at trial.

sequently, the addition of the stabilizing ingredients is permissible under note 1(f) to Chapter 29, and does not exclude the merchandise from classification under Heading 2936. As a result, the merchandise is included in the class of goods covered by Heading 2936 and its subheadings.

Because the merchandise is classifiable under another heading, Roche has overcome the presumption of correctness to which Customs' classification was entitled. As noted, to fall under Customs' selected heading, Heading 2106, an imported good must be both (1) a food preparation, and (2) not elsewhere specified or included. The trial evidence demonstrated that the merchandise is a provitamin and is not particularly suited to specific use, rendering it classifiable within Heading 2936. As such, the merchandise is "elsewhere included." Therefore, Roche has demonstrated that BetaTab fails the second requirement for classification in Heading 2106 and that Customs' decision to classify the BetaTab in that heading is incorrect.

**II. The Merchandise is Properly Classified under HTSUS Subheading 2936.10.00**

Under GRI 6, "the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes" and by application of the other GRIs. Within Heading 2936, there are only two potentially applicable subheadings: 2936.10.00 [9] and 2936.90.00.[10] Subheading 2936.10.00 covers "[p]rovita-

mins, unmixed" and 2936.90 is a basket category covering "[o]ther, including natural concentrates." Thus, because the BetaTab consists of provitamin A with added stabilizing ingredients, selection of the appropriate subheading turns on the construction of the term "unmixed."[11]

The terminology of Heading 2936 makes clear that Congress intended the term "unmixed" in subheading 2936.10.00 to indicate that the subheading does not encompass mixtures of different kinds of vitamins or provitamins, but does encompass mixtures of vitamins or provitamins with the stabilizing ingredients permitted by note 1(f) to Chapter 29. In other words, a vitamin or provitamin that is mixed with other ingredients that are not "[p]rovitamins [or] vitamins" remains "unmixed" for purposes of classification in subheading 2936.10.00. Thus, the 2936.10.00 term "unmixed" means "unmixed with other vitamins or pro-vitamins."

The heading language, common to both 2936.10.00 and 2936.90.00 confirms this conclusion. That language, "intermixtures of the foregoing, whether or not in any solvent," makes clear the congressional intention that goods of the heading are to be treated differently from other ingredients for purposes of what is a "mixture." The phrase "of the foregoing" limits the ordinarily broad term "intermixture" to combinations of "[p]rovitamins and vitamins, natural or reproduced by synthesis (including natural concentrates), derivatives thereof used primarily as vitamins." The

**9.** HTSUS 2936.10.00 reads in full: "Provitamins and vitamins, natural or reproduced by synthesis (including natural concentrates), derivatives thereof used primarily as vitamins, and intermixtures of the foregoing, whether or not in any solvent: Provitamins, unmixed."

**10.** HTSUS 2936.90.00 reads in full: "Provitamins and vitamins, natural or reproduced by

synthesis (including natural concentrates), derivatives thereof used primarily as vitamins, and intermixtures of the foregoing, whether or not in any solvent: Other, including natural concentrates."

**11.** It is worth noting that all of the subheadings of heading 2936 carry a duty rate of "Free."

phrase "whether or not in any solvent" further indicates that Congress did not intend the terms "mixture" and "intermixtures" to include the combination a provitamin of the heading and substances outside the heading. Otherwise, the express inclusion of solvents would be surplusage, as any solvent-provitamin combination would be an "intermixture." *Marx v. Gen. Revenue Corp.,* —— U.S. ——, 133 S.Ct. 1166, 1178, 185 L.Ed.2d 242 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

**[20]** That this narrower understanding of the term "mixture" carries down to the subheading level is shown by the structure of the subheadings. All of 2936's subheadings refer to a plural noun or conjunction followed by: ", unmixed" with the exception of 2936.90.00, the catch-all. *Compare* HTSUS 2936.90.00 ("Other, including natural concentrates"), *with* HTSUS 2936.10.00 ("Provitamins"), HTSUS 2936.21.00 ("Vitamin A"), 2936.22.00 ("Vitamin $B_1$"), 2936.23.00 ("Vitamin $B_2$"), 2936.24.00 ("Vitamin $B_3$ or Vitamin $B_5$"), 2936.25.00 ("Vitamin $B_6$"), 2936.26.00 ("Vitamin $B_{12}$"), 2936.27.00 ("Vitamin C"), 2936.28.00 ("Vitamin E"), *and* 2936.29.00 ("Other vitamins and their derivatives"). Thus, if the term "unmixed" were construed to include mixtures of the named vitamins and provitamins of the heading with *any* other substance, then the addition of any of the water, stabilizers, solvents, antidusting agents, colorings, and odoriferous substances expressly permitted by notes 1(d) through (g) to Chapter 29, would prohibit classification of those substances under

their eo nomine [12] subheadings. That is, under that interpretation, any vitamin or provitamin requiring the addition of those substances for transport, safety, or stabilization would automatically be pushed into the basket subheading. Such a reading makes little sense. Thus, the subheadings and the Chapter notes, read together, indicate that the term "unmixed" contained in the subheadings of Heading 2936 is intended to mean "unmixed with the other vitamins and provitamins of this heading."

Accordingly, the additional stabilizing ingredients added to the beta-carotene crystalline to create the BetaTab do not render the product a mixture for purposes of subheading 2936.10.00. Therefore, because BetaTab is a provitamin compound, subheading 2936.10.00 is the correct subheading and the merchandise is properly classified thereunder.

### CONCLUSION

For the reasons stated above, the court concludes that the correct tariff classification for the BetaTab 20% is HTSUS subheading 2936. 10.00 and the merchandise is subject to a duty rate of "Free." Judgment will enter accordingly.



---

**12.** "An *eo nomine* provision is one 'in which an item is identified by name.' " *Arko Foods Int'l, Inc. v. United States,* 33 CIT ——, ——, 679 F.Supp.2d 1369, 1375 n. 24 (2009) (quoting *Len–Ron Mfg. Co. v. United States,* 334 F.3d 1304, 1308 (Fed.Cir.2003)).

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 18th day of February,

2014, a copy of the foregoing BRIEF FOR DEFENDANT-APPELLANT THE

UNITED STATES was filed electronically.

**X** This filing was served electronically to all parties by operation of the

Court's electronic filing system.

_____/s/ Patricia M. McCarthy_____

## CERTIFICATE PURSUANT TO RULE 32(A)(7)(C)

I, Patricia M. McCarthy, certify that this brief, excluding tables and certificates, contains 5,107 words (relying upon the Microsoft Word word count feature of the word processing program used to prepare this brief) and complies with the type-volume limitation contained in Rule 32(a)(7)(B).

＿＿s/Patricia M. McCarthy＿＿＿＿＿